978 F.2d 1258
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Deborah K. BAKER and Thomas Baker, Plaintiffs-Appellants,
v.
The MEREDITH CORPORATION, Defendant-Appellee.
 No. 91-2354.
 United States Court of Appeals, Sixth Circuit.
 Oct. 28, 1992.
 
 Before KEITH, KENNEDY and NATANIEL R. JONES, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff, Deborah K. Baker, appeals summary judgment for Defendant, The Meredith Corporation ("WNEM"), on her claims of wrongful discharge and intentional infliction of emotional distress in this diversity case. Finding Baker's evidence insufficient, as a matter of law, to take these matters to a jury, we affirm the decision of the district court.
 
 I. The Case
 
 2
 Baker began her employment with WNEM in June 1970 as a clerk/typist. At the time of her hiring, there was no discussion as to the duration of her employment. She signed no contract of employment. And she was neither told nor given anything in writing to the effect that her employment was terminable only for cause.
 
 
 3
 Throughout the course of her employment, Baker received written job appraisals from her various supervisors. Nowhere in these appraisals was termination only for cause mentioned. At no other time during her employment did Baker receive any written material specifically to this effect.
 
 
 4
 Through a series of promotions resulting from meritorious job performance, Baker attained the position of traffic administrator in 1988. In 1989, things soured for Baker at WNEM when she was assigned a new supervisor, Gary Rivard. The two simply did not get along.
 
 
 5
 In August 1990, after about a year under Rivard's supervision, Baker went to the general manager, Paul Virciglio, about her problems with Rivard. Rivard learned that Baker had gone over his head and became incensed. He held a private meeting with Baker, during which he allegedly exclaimed, "I'm so pissed off at you I can't even look at you.... I don't know if I can ever forget what you have done to me.... Nobody will do to me what you have done to me and still be working for this company." He purportedly raised his left hand toward her. Baker was well into her first pregnancy at the time and suggests to this court that this fact heightened her "physical and emotional" reaction to the confrontation. After the spat, Rivard allegedly moved Baker's desk to the back of her department and excluded her from interdepartmental communications. Baker was soon assigned a new supervisor, Sandra Langworthy.
 
 
 6
 Baker took a maternity leave in October 1990. Shortly thereafter, Langworthy supposedly gave Baker her lowest performance appraisal ever, as well as a new job description. According to Baker, Langworthy visited her several times during her maternity leave, and allegedly pressured Baker not to return to work on three separate occasions. Langworthy claims to have visited just once, to see the new baby.
 
 
 7
 Baker returned to her job on January 21, 1991. Upon her return, she was presented with yet another new job description, and found that another employee had been given her desk.
 
 
 8
 On January 25, 1991, Rivard and Langworthy met with Baker in a glass-enclosed conference room. They allegedly told her that her work and attitude were unacceptable, and that the department had run well during her absence, but was not running well upon her return. Baker claims they also told her she had to say "please" and "thank you" and that she could not use the phrase "screwed up." Rivard purportedly made Baker read part of her job description aloud. Rivard and Langworthy allegedly warned her that unless her work and her attitude improved, she would receive further discipline. Baker says that she left work that day crying.
 
 
 9
 On January 28, 1991, Baker tried to meet with Langworthy, who refused. Rivard gave her a memo reiterating his complaints about her performance, as well as threats of further discipline. Baker claims she was devastated, and became physically and emotionally ill. She resigned before the next business day.
 
 
 10
 Thereafter, she has sought medical care for "severe emotional distress" and has been under nerve medication.
 
 
 11
 Baker and her husband filed suit in the Saginaw [Michigan] County Circuit Court on May 13, 1991. Baker alleged wrongful discharge, sexual harassment, and intentional infliction of emotional distress due to the discharge and the events leading up to it. Her husband claimed loss of consortium due to his wife's emotional distress.
 
 
 12
 WNEM had the case removed to the United States District Court for the Eastern District of Michigan (notice filed May 28, 1991). On October 28, 1991, WNEM filed a motion for summary judgment. On November 20, 1991, this motion was granted after a hearing on the matter. Dorothy Baker timely appealed dismissal of the wrongful discharge and intentional infliction of emotional distress claims.
 
 II. Standard of Review
 
 13
 This court's review of a grant of summary judgment is de novo. Brooks v. American Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991). We apply the same test as that used by the district court. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988).
 
 III. The Wrongful Discharge Claim
 
 14
 Baker was not formally discharged from WNEM; she resigned. On appeal, WNEM does not take issue with Baker's claim that she was "constructively discharged."
 
 
 15
 Both parties treat the chief issue to be resolved on appeal as whether a genuine issue of material fact exists as to the proper classification of Baker as WNEM employee. Baker argues that she could be terminated only for cause; WNEM contends that she was an employee-at-will. There are no documents in the record which clearly state either. Baker's case is built upon inferences from the written and spoken word. The question thus is this: According to Michigan law, are these inferences sufficient to rebut Michigan's presumption of employment-at-will in order to survive a motion for summary judgment? We answer this question in the negative, and affirm the decision of the district court.
 
 
 16
 In Michigan, employment is presumed to be at-will. Rowe v. Montgomery Ward & Co., 473 N.W.2d 268, 271 (Mich.1991). This presumption, however, may be overcome by evidence of an express oral or written agreement to the contrary, or "as a result of an employee's legitimate expectations grounded in an employer's policy statements." Toussaint v. Blue Cross & Blue Shield, 292 N.W.2d 880, 885 (Mich.1980); see Rowe, 473 N.W.2d at 272; Bullock v. Automobile Club, 444 N.W.2d 114, 117 (Mich.1989), cert. denied, 493 U.S. 1072 (1990); Dumas v. Auto Club Ins. Ass'n, 473 N.W.2d 652, 655-56 (Mich.1991).
 
 
 17
 Baker contends that WNEM created a legitimate expectation of continued employment through oral and written statements. Specifically, she directs our attention to oral statements by management, WNEM-promulgated policy handbooks, a personnel manual, attitude surveys, and performance appraisals.
 
 
 18
 Baker has recounted the relevant oral statements in an affidavit submitted to the district court:
 
 
 19
 Throughout my tenure, I had repeatedly received verbal assurance from management including Todd Holmes and Paul Virciglio that performance was the key to a secure future. Comments such as "You're a fixture around here" and "We could never do without you" further contributed to my expectation of a secure job.
 
 
 20
 "[O]ral statements of job security must be clear and unequivocal to overcome the presumption of employment at will." Rowe, 473 N.W.2d at 275. We do not find the alleged oral statements to rise to the level of "clear and unequivocal" expressions of employment-for-cause.
 
 
 21
 Likewise, the policy handbooks seem to merely suggest that if employees perform well, they will get raises and increased responsibilities. There does not seem to be any reasonable implication from this that employees could only be removed for cause.
 
 
 22
 The portion of the personnel manual on which Baker relies reads as follows:
 
 
 23
 Meredith Corporation intends to apply [the following policy, among others] as a general rule. However, there may be cases in which business considerations warrant an exception to these policies.
 
 
 24
 ...
 
 B. Involuntary Separations
 
 25
 1. Discharges for cause, including misconduct such as dishonest, willful negligence, insubordination, absence without leave, excessive absenteeism, divulging confidential information, etc.
 
 
 26
 2. Termination for failure to satisfactorily perform the job requirements of a position. Such employees may be given the opportunity to resign voluntarily. If the employee does not voluntarily resign, the separation will be classified as a "discharge."
 
 
 27
 3. Termination due to unsuitability to meet new or changed performance requirements brought about by such things as new technology, reorganization, market conditions, etc.
 
 
 28
 While this manual lists grounds for involuntary termination, it is not inconsistent with a general policy of employment-at-will. See Rowe, 473 N.W.2d at 275 ("Nothing in the rules suggested that the enumerated conduct was the only basis for dismissal, and the rules were consistent with a termination-at-will policy. Thus, we find no evidence from which a reasonable promisee could find a promise of job security."); accord Biggs v. Hilton Hotel Corp., No. 131470 (Mich.App. Feb. 20, 1992) (per curiam).
 
 
 29
 Baker argues that WNEM-implemented attitude surveys served to create in her a legitimate expectation of for-cause employment. WNEM would ask questions of employees, and later tell them what they considered "favorable" responses to be. For example, the "favorable" response to the statement, "I feel I could be fired without much cause," was "Disagree." And, the "favorable" response to the statement, "As long as I do good work, I can be sure of my job," was "Agree." Baker seems to have given the "favorable" responses.
 
 
 30
 Though WNEM thought it "favorable" for employees to think they had for-cause employment, a significant percentage of employees responded unfavorably. Despite the number of people who issued "unfavorable responses," WNEM issued no policy statement to change their minds. It is not reasonable to conclude from this that a legitimate expectation of for-cause employment was created.
 
 
 31
 Finally, Baker contends that performance appraisals and WNEM's statements on its appraisal program served to create in her a legitimate expectation of for-cause employment. As with the policy manuals, we find that this evidence merely reflects WNEM's goal of encouraging superior performance. It cannot reasonably be said to create a legitimate expectation of for-cause employment.
 
 
 32
 Considered as a whole, Baker's evidence is not sufficient, as a matter of law, to rebut the presumption of at-will employment in Michigan. Indeed, the Michigan Supreme Court has ruled against a plaintiff in similar circumstances with seemingly stronger evidence than Baker has to offer. See Rowe, 473 N.W.2d at 270-75. Baker has not presented sufficient evidence of for-cause employment to take this matter to a jury. We thus affirm the decision of the district court on this issue.
 
 
 33
 IV. Intentional Infliction of Emotional Distress
 
 
 34
 Baker charges WNEM with the intentional infliction of emotional distress. Though the Michigan Supreme Court has not formally recognized this intentional tort, the Michigan Court of Appeals has, and has adopted the definition of the Restatement (Second) of Torts § 46 (1965) [hereinafter Restatement ], which contains four basic elements:
 
 
 35
 (1) Extreme and outrageous conduct by defendant.
 
 
 36
 (2) Intent or recklessness of defendant.
 
 
 37
 (3) Causation.
 
 
 38
 (4) Severe emotional distress in plaintiff.
 
 
 39
 See, e.g., Margita v. Diamond Mortgage Co., 406 N.W.2d 268, 271 (Mich.App.1987). In Pratt v. Brown Machine Co., 855 F.2d 1225, 1238-39 (6th Cir.1988), the Sixth Circuit decided to follow the Michigan Court of Appeals as the law of Michigan on this matter.
 
 
 40
 Baker contends that the activities of WNEM employees amount to extreme and outrageous conduct. WNEM and the district court contend they do not. We agree with the latter view.
 
 
 41
 Comment d to Restatement § 46 fleshes out the meaning of "extreme and outrageous conduct," as it summarizes how courts have generally treated the subject:
 
 
 42
 The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arise his resentment against the accuser, and lead him to exclaim, "outrageous."
 
 
 43
 In short, the facts supporting Baker's contention that she is the victim of intentional infliction of emotional distress, viewed in a light most favorable to her, see supra sec. I, do not "go beyond all possible bounds of decency." We thus affirm the district court's order of summary judgment on this issue as well.