UNITED STATES of America, Plaintiff,

v.

STATE OF MICHIGAN, James J. Blanchard, Governor of Michigan, Michigan Corrections Commission; Gwen Andrew, Chairman, Michigan Corrections Commission, Thomas Eardley, G. Robert Cotton, Dwayne Waters, Don Le Duc, Members, Michigan Corrections Commission, Michigan Department of Corrections, Perry M. Johnson, Director, Michigan Department of Corrections, Robert Brown, Jr., Deputy Director, Michigan Department of Corrections, Dale Foltz, Regional Administrator, State Prison of Southern Michigan, John Jabe, Warden, Michigan Reformatory, Theodore Koehler, Warden, Marquette Branch Prison, John Prelesnik, Administrator, Reception and Guidance Center, State Prison of Southern Michigan, and Jack Bergman, Administrator, Michigan Intensive Programming Center, Defendants.

No. G84–63.

United States District Court,
W.D. Michigan, S.D.

March 3, 1988.

Andrew J. Barrick, U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., for plaintiff.

National Prison Project of the American Civil Liberties Union by Elizabeth Alexander and Adjoa Aiyetoro, Washington, D.C., and Patricia A. Streeter, Detroit, Mich., as amicus curiae.

Frank J. Kelly, Atty. Gen., State of Mich. by Thomas Nelson and Brian MacKenzie, Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

The issue to be addressed in this opinion is whether the defendants' use of food loaf for prisoners in segregation units violates either the standards created by the Consent Decree and the State Plan for Compliance or constitutional standards. Food loaf

is a substance prepared by grinding up and combining the various components of a regular prison meal.[1] This substance is formed into a loaf and baked. The baked loaf is then tightly wrapped in plastic and served to the inmate without tray or utensils. The only liquid provided to a prisoner placed on food loaf is water, which is made available through drinking fountains installed in segregation cells. All parties appear to agree that the caloric and nutritional content of the food loaf is substantially similar to the caloric and nutritional content of normal prison meals. Indeed, there could be little dispute on that issue, since the food loaf is prepared, as I have indicated, by combining the various items which make up a regular meal.

At present, the Department's Policy Directive number PD–BCF–50.04 (Jan. 1, 1987) provides that:

> A prisoner housed in segregation may be immediately placed on the food loaf if he or she is observed engaging in any of the following behavior:
>
> 1. Misuse of food, serving tray, or eating utensils.
> 2. Refusing or failing to return uneaten food, the serving tray, dishes or eating utensils to the door slot....
> 3. Destroying a serving tray or throwing a tray or food.
> 4. Using containers to hold or throw other substances, such as human waste products.

Upon observing such behavior, staff must complete a misconduct report. The inmate is then placed on food loaf beginning with the next meal. The diet continues, three meals a day, for fourteen days, unless a hearing officer determines that the prisoner did not engage in the conduct as charged. Prisoners with special diet restrictions are given food loaf prepared within those restrictions, with certain notable exceptions. Prisoners with food allergies that do not require dietary restrictions or prisoners who are lactose-intolerant do not receive food loaf which omits those foods. Nothing in the policy restricts the number of times a prisoner may be placed on food loaf, nor does the policy require a period of normal meals between impositions of food loaf.

Defendants maintain that this policy was instituted not as a punitive measure, but as an administrative measure to control certain behavior which has become a serious problem in the segregation units at the consent decree institutions—the throwing of food, utensils and human waste by prisoners.[2] Testimony at the previous compliance hearing indicated that this behavior is a relatively serious problem in the segregation units at the decree institutions, and one which contributes to the explosive environment that presently exists in those units. It also appears that the behavior is more frequently targeted toward guards, although prisoners are also subjected to it.

As indicated above, prisoners are placed on food loaf without the benefit of a prior hearing to determine whether the behavior charged actually occurred. A disciplinary hearing is held, however, sometime after the prisoner is placed on food loaf.[3] The policy directive provides that the hearing officer may make one of three determinations. First, the hearing officer may determine that the prisoner did not engage in the conduct as charged. In this instance, the prisoner is immediately returned to normal meals. Second, the hearing officer may determine that the prisoner is guilty

---

1. As *amicus* points out, food loaf is prepared from a limited number of menus. Thus, the contents of a food loaf do not necessarily coincide with the items served to prisoners receiving regular meals on a given day. However, the food used to prepare food loaf does not differ from the food used to prepare regular meals, and while there is not as much variety in the content of food loaf as there is in the content of regular meals, it is clear that food loaf menus do change from day to day. Food loaf is not always prepared from the same "recipe."

2. Witnesses and parties frequently referred to food loaf as a "behavior modification" device.

3. There was no evidence indicating the length of time between the deprivation of regular meals and the hearing. I will, therefore, assume that the hearings are held on a reasonably prompt schedule.

of misconduct as charged. In this instance, the food loaf diet continues for fourteen days. Finally, the hearing officer may determine that the misconduct charge must be dismissed for "procedural reasons," but that the prisoner in fact engaged in the conduct as charged. In this event, the prisoner remains on food loaf for the entire fourteen day period, although the misconduct charge is deleted from his file.

The use of food loaf in segregation units raises at least three questions. First, the Court must determine whether its use violates the Consent Decree and the State Plan for Compliance. Second, I must determine whether food loaf constitutes a cruel and unusual punishment within the meaning of the Eighth Amendment. And finally, I must determine whether its use implicates the due process rights of prisoners in segregation units.

■ 1. *The Consent Decree.* As the parties and *amicus* agree, the starting point for any discussion of this issue must be the Consent Decree and the State Plan for Compliance entered in this case. Neither document addresses the use of food loaf itself.[4] The State Plan for Compliance, however, provides that, "Prisoners in segregation and RGC shall continue to be served three meals per day, which are essentially the same meals as those served to general population." State Plan for Compliance § J(2). In evaluating whether food loaf violates the Consent Decree, then, the Court must determine whether food loaf is "essentially the same" as the meals served to prisoners in the general population.

*Amicus* argues strenuously that food loaf is not the same as the food served to the general public, pointing out that, "One could as easily argue that a child's water colors are 'essentially the same' as those of Claude Monet because both creations are formed from the same materials." *Amicus* Brief in Support of an Order Banning Food Loaf at 2. While the argument is not without some logical appeal, I must disagree.

Food loaf is prepared from the same food items as meals served to the general population. While the contents of food loaf on any given day may be different from the contents of the regular prison meal, the food loaf is prepared using "normal" ingredients, and its contents, like the contents of a regular prison meal, differ from day to day. The caloric content of a food loaf meal is similar to the caloric content of a meal comprised of separate food items, and the nutritional value of the loaf is comparable to the nutritional value of the regular meals. The primary difference between food loaf and the regular meal is in its preparation, not its content. But that difference is not so striking as to make food loaf not "essentially the same" as the regular prison meal, at least not as the food loaf policy is presently written.[5] Moreover, food loaf is not the "normal" meal inside the segregation units. It is given to inmates who have engaged in certain prohibited behavior, and it is given to them for a relatively short period of time, at least in most instances. Because the content of the food loaf is essentially similar to the content of normal prison meals, and because it is not fed to prisoners as a matter of course, but rather only as a result of the prisoner's negative conduct, I can find no grounds for holding that its use violates either the Consent Decree or the State Plan.[6]

---

4. It appears that defendants began using food loaf in segregation units only after the entry of the Consent Decree and the State Plan.

5. I would not be prepared, for example, to hold that food loaf could be served to every prisoner in segregation, for every meal and for an extended period of time without violating the Consent Decree and the State Plan. If that were the defendants' practice, then the argument that similarity among meals should be judged more by the method of food preparation than by the meal's content would carry more weight. But

that is not the issue presented. Rather, the issue is whether the use of food loaf for the reasons, and within the guidelines established by the present policy directive violates the consent decree.

6. Because the use of food loaf complies with the standards set in the Consent Decree and the State Plan, the defendants had no duty to report their decision to implement policy directive PD–BCF–50.04, either to the Court or to the parties. Similarly, no modification of the Decree or Plan is necessary to allow its continued use.

2. *The Eighth Amendment.* The fact that food loaf does not violate the Consent Decree would not sanction its use if the practice constituted cruel and unusual punishment within the meaning of the Eighth Amendment. I have no trouble characterizing the use of food loaf as a "punishment," despite the defendants' protestations to the contrary. Defendants characterize the practice as "an administrative action taken to maintain a clean and healthy environment," and have repeatedly claimed that food loaf is not used as a "sanction for misconduct," but rather as a method for removing "the opportunity for such behavior." Policy Directive PD–BCF–50.04. An analysis of the actual imposition of food loaf, however, indicates that it is, indeed, a punishment.

Food loaf is imposed only for specific types of misconduct. Its use is always accompanied by a misconduct report and disciplinary charge. There can be no doubt that eating food loaf is less pleasant than eating a regular prison meal, and thus, it is not difficult to conclude that inmates placed on food loaf consider it to be a punishment for misconduct. Moreover, the purpose of food loaf, as described by the policy directive, indicates its punitive character. It is specifically designed to prevent the throwing of food, utensils and human waste by removing the opportunity to engage in that behavior and also, hopefully, by impressing inmates with the understanding that extremely unpleasant results will occur whenever they engage in the prohibited behavior.[7]

Finally, witnesses at the most recent compliance hearing testified that food loaf was a necessary measure in order to maintain staff morale within the segregation units. *See also,* Defendants' Memorandum of Law Regarding Food Loaf, at 4. As Ms. Burke testified, staff subjected to such repulsive behavior by inmates must be given some professionally sanctioned outlet for their very understandable feelings of anger toward the misbehaving inmate. Defendants point out in their brief that, "It is both unrealistic and unreasonable to expect any human being to maintain professional detachment under a daily barrage of food and human waste." *Id.* While I completely agree that staff must have an immediate, yet professional, response to this sort of behavior, it seems to me that this recognition in itself identifies food loaf as a punishment. The administration might consider food loaf a "behavior modification device," or an "administrative measure," but if staff impose it in order to respond to negative and personally offensive behavior, as they appear to do, then they must consider it a punishment. *Cf. Molton v. City of Cleveland,* 839 F.2d 240 (6th Cir.1988) (whether condition is a punishment depends, in part, upon the purpose of maintaining that condition).

■ Having decided that food loaf is a punishment in fact, if not in name, the next question is whether that punishment may be considered cruel and unusual within the meaning of the Eighth Amendment. I hold that it may not. Since the general standards to be employed in discussing Eighth Amendment issues are well understood,[8] I

---

**7.** As I understand the theory behind behavior modification techniques, it is to prevent repeated instances of negative behavior by consistently reacting to that behavior in an unpleasant manner. Thus, the subject is trained to associate the behavior with the unpleasant response and will hopefully avoid the behavior in order to avoid its consequences. Regardless of its name, there appears to me to be no difference between this sort of "treatment" and any operable definition of "punishment."

**8.** *See e.g., Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (Punishments involving the "wanton infliction of pain" violate the Eighth Amendment); *Estelle v. Gamble,* 429 U.S. 97, 104–05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976) ("deliberate indifference to serious medical needs constitutes 'unnecessary and wanton infliction of pain'"); *Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 594–98, 2 L.Ed.2d 630 (1950); *Weems v. United States,* 217 U.S. 349, 373, 30 S.Ct. 544, 551, 54 L.Ed.2d 793 (1910); *Cunningham v. Jones,* 567 F.2d 653 (6th Cir.1977); *LaBatt v. Twomey,* 513 F.2d 641 (7th Cir.1975); *French v. Heyne,* 547 F.2d 994 (7th Cir.1976); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854 (4th Cir.1975); *Sostre v. South Carolina Department of Corrections,* 529 F.2d 854 (4th Cir.1975); *Sostre v. McGinnis,* 442 U.S. 178 (1971); *Wright v. McMann,* 387 F.2d 519 (2d Cir.1967); *Hancock v. Avery,* 301 F.Supp. 786 (M.D.Tenn.1969).

see no reason to repeat them at length here. Turning to the specific issue at hand, it appears to this Court that the Eighth Amendment requires no more than that prison officials provide inmates with a diet which is nutritionally adequate for the maintenance of normal health. *Cunningham v. Jones,* 567 F.2d 653, 656, 660 (6th Cir.1977) ("deliberate and unnecessary withholding of food essential to normal health can violate the Eighth Amendment"). *See also Hamm v. DeKalb County,* 774 F.2d 1567, 1575 (11th Cir.1985) ("The Constitution requires that prisoners be provided 'reasonably adequate food'.... The fact that the food occasionally contains foreign objects or sometimes is served cold, while unpleasant does not amount to a constitutional deprivation."); *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Jones v. Diamond,* 636 F.2d 1364, 1378 (5th Cir. 1981); *Smith v. Sullivan,* 553 F.2d 373, 380 (5th Cir.1977) ("A well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required."). Where food is prepared and served in a sanitary manner and is nutritionally adequate to maintain normal health, the fact that it is unappetizing will not, standing alone, state a constitutional claim. *See, e.g., Falter v. Veterans Administration,* 632 F.Supp. 196, 210–11 (D.N.J.1986).

At least one court has held that food which is minimally adequate to sustain normal health, yet "tasteless [and] unappetizing" might present a constitutional issue. In *Finney v. Arkansas Board of Correction,* 505 F.2d 194, 207–08 (8th Cir.1974), the Eighth Circuit remanded a prison conditions case to the district court after reversing that court's decision to terminate its continuing jurisdiction over the Arkansas prison system. The circuit court found "dubious" the district court's conclusion that "grue," a "tasteless, unappetizing paste-like food which is served to prisoners in solitary confinement as a form of further punishment," was a nutritionally sufficient diet. *Id.* at 207. On remand, the district court reconsidered use of "grue,"

and concluded that its use as a steady diet for prisoners in segregation violated the Eighth Amendment. *Finney v. Hutto,* 410 F.Supp. 251 (E.D.Ark.1976). The district court noted:

> While the evidence is to the effect that "grue" ... will not only sustain life but is adequate nutritionally for an inmate who is not leading an active life, the evidence also discloses that some inmates simply will not eat the "grue" or will not eat much of it, and that practically all inmates lose weight while in punitive isolation....

410 F.Supp. at 276 notes 12. As both the Eighth Circuit and the district court noted, the prison's practice of alternating grue with regular meals and of conducting a medical examination of each prisoner being fed "grue" indicated that its use posed a threat to the health of the prisoners in segregation.

I find it significant, if not controlling, that there was no evidence in this case indicating either that prisoners fed food loaf refused to eat it, or that they sustained abnormal weight losses or other adverse health effects while on the food loaf diet. It thus appears that the health dangers which caused the Eighth Circuit to ban the use of "grue" are not presented by food loaf. Moreover, unlike "grue," food loaf is prepared from the same ingredients which make up a regular prison meal, and its contents vary from day to day. While it is certainly not as appealing as a meal made up of separate food items, and while it may be unappetizing, it is not so deficient that it poses a risk to the health of the prisoners receiving it. Thus, it appears to the Court that food loaf does not, as a matter of law, in every case, violate the Eighth Amendment's prohibition against cruel and unusual punishment.

This is not to say that the use of food loaf could never pose a constitutional question in a particular case. As *amicus* point out, placing a particular prisoner on the food loaf diet may indeed constitute "deliberate indifference" to that prisoner's medical needs. For example, it may be deliberately indifferent to place a prisoner com-

promised by AIDS infection on such a diet, or to impose food loaf upon a prisoner with certain food allergies or other medical problems which do not require that the prisoner be placed on a special diet. But the question presented here is whether the use of food loaf at all times and for all prisoners violates the Eighth Amendment. While it may constitute a violation for some specific prisoner, I cannot hold that its use always constitutes cruel and unusual punishment.

My opinion also should not be interpreted to say that the use of food loaf as a sanction for certain relatively innocuous misbehaviors would not pose a constitutional question. In *Moss v. Ward,* 450 F.Supp. 591 (W.D.N.Y.1978), a prisoner was deprived of all food for four days because he failed to return a plastic cup following the completion of a meal. The prisoner indicated that he needed the cup to store his dentures. While the court refused to find that denial of food "is a per se violation of a prisoner's Eighth Amendment rights," it found that the denial of food under those facts was such a violation because there was "no showing that the prisoner [engaged] in the conduct the rule is designed to prevent." *Id.* at 596. The court specifically noted that:

> Although being deprived of one or two meals might not be cruel and unusual punishment, prison officials cannot impose such severe sanctions for breaking a disciplinary rule, as occurred in the instant case, on prisoners when there is no showing that the prisoner is engaging in the conduct the rule is designed to prevent.

*Id.* at 596. Such a punishment would contravene the Eighth Amendment because it would be grossly disproportionate to the offense for which it is being imposed and because it would go beyond what is necessary to achieve a legitimate aim. *Id.* at 597.

The same standards would, in all likelihood, apply to the use of food loaf. Without some showing that the prisoners consigned to such a diet engaged in the behavior sought to be controlled—i.e., the throw-

ing of food or human waste—the imposition of food loaf might indeed violate the Eighth Amendment because it would be grossly disproportional to the offense committed and because it would go far beyond what is necessary to achieve the state's legitimate needs. But again, this is a judgment which could only be made in a specific case, with regard to a specific prisoner. The fact that food loaf may, in some instances, constitute a cruel and unusual punishment is not enough to hold that it violates constitutional standards in every case. *See, e.g., Hutto v. Finney,* 437 U.S. 678, 686–87, 98 S.Ct. 2565, 2571–72, 57 L.Ed.2d 522 (1978).

■ 3. *The Due Process Clause.* The final issue to consider is whether the use of food loaf implicates the due process rights of prisoners in the segregation units. As the Sixth Circuit recently noted in *Beard v. Livesay,* 798 F.2d 874 (6th Cir.1986), "A state, by its own actions, may create liberty interests protected by the due process clause." *Id.* at 876. *See also, Hewitt v. Helms,* 459 U.S. 460, 469, 103 S.Ct. 864, 870, 74 L.Ed.2d 675 (1983); *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983); *Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 2539, 49 L.Ed.2d 451 (1976); *Bills v. Henderson,* 631 F.2d 1287 (6th Cir.1980); *Williams v. Lane,* 548 F.Supp. 927 (N.D.Ill. 1982) (prison regulation created liberty interest in segregation meals comparable to those provided for the general population). Prison officials may create liberty interests by policy statements, regulations, or other official promulgations. *Beard,* 798 F.2d at 877; *Walker v. Hughes,* 558 F.2d 1247, 1255 (6th Cir.1977). The Sixth Circuit explained the criteria for determining whether a prison policy or regulation creates an enforceable liberty interest in *Bills v. Henderson,* 631 F.2d 1287 (6th Cir.1980). In that case, the court held:

> Where statutes or prison policy statements have limited prison officials' discretion by imposing a specific prerequisite to the forfeiture of benefits or favorable living conditions enjoyed by a prisoner, an expectation or entitlements has been created which cannot be taken away

without affording the prisoner certain due process rights. On the other hand, when prison officials have complete discretion in making a decision that will affect the inmate, no expectation or protected liberty interest has been created. *Id.* at 1292–93. As the Supreme Court succinctly stated in *Olim*, "If the decisionmaker is not 'required to base its decisions on objective and defined criteria,' but instead 'can deny the requested relief for any constitutionally permissible reason or for no reason at all,' the State has not created a constitutionally protected liberty interest." 461 U.S. at 249, 103 S.Ct. at 1747. While the creation of procedural guidelines or requirements, standing alone, will not be sufficient to establish a liberty interest, *Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871, where the state goes beyond such guidelines "by using 'mandatory language' in connection with 'specific substantive predicates,' a liberty interest may be found." *Beard*, 798 F.2d at 877.

■ Applying these criteria to the case at hand, the Court finds that Policy Directive PD–BCF–50.04 creates a constitutionally protected liberty interest in not being deprived of regular prison meals or, alternatively, in not being placed on food loaf. The policy directive contains the necessary mandatory language, and clearly places substantive limitations upon the discretion of prison officials to order that a particular inmate be placed on the food loaf diet. First, the policy directive defines the specific types of misbehavior for which food loaf may be imposed. An inmate may be placed on food loaf only if he engages in

the behaviors indicated in the policy, and the policy creates a relatively narrow class of behavior meriting this particular punishment. Second, it indicates that any instance of the listed misbehavior will be punished by the use of food loaf.[9] Finally, the policy directive purports to constrain the discretion of the hearing officer reviewing the imposition of food loaf by defining the instances in which a prisoner may be made to continue receiving these meals.[10] Thus, I find that this policy does more than create procedural requirements—it confers upon prisoners a liberty interest by specifically defining the behaviors for which food loaf may be imposed and the conditions under which its use may continue.

Having determined that prisoners in segregation have a liberty interest in not being deprived of regular prison meals, the question to be answered is what process is due those prisoners in this context. *See, Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Walker v. Hughes,* 558 F.2d 1247 (6th Cir.1977). As the Supreme Court noted in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), that inquiry, "must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by government action." *Id.* at 481, 92 S.Ct. at 2600. In this case, it appears to the Court that the state's interest in preventing the throwing of food items and human waste by prisoners in segregation is strong indeed. Not only does such behavior pose a threat to the safety of guards and prison-

---

**9.** At some points the policy states that a prisoner "may" be placed on food loaf, apparently indicating that the staff member observing such behavior has discretion to decide whether to impose that punishment. However, the policy also notes that, "A Staff member who observes *will immediately* write a misconduct report containing the appropriate charge or charges based upon the behavior which has been observed. It *shall* be noted on the misconduct report that the prisoner has been placed on food loaf." The policy further requires staff members to immediately notify their shift commander of such misbehavior, it requires the shift commander to notify Food Service and its requires Food Service to serve the prisoner food loaf beginning with the next meal. The fact that the policy at

some points uses discretionary language does not negate the existence of a liberty interest where the policy is so clearly intended to be mandatory and to place substantive limitations on the use of this particular punishment.

**10.** As indicated earlier, the hearing officer may order the prisoner returned to normal meals only if he or she finds that the prisoner did not engage in the conduct as charged. If the hearing officer finds that the charge is merited, or that the behavior in fact occurred, then the prisoner remains on food loaf for fourteen days. Thus, the policy places substantive limitations upon the hearing officer in the same way as it limits the discretion of other staff members.

ers, but it contributes to the myriad difficulties associated with providing a sanitary living environment inside the segregation units. On the other hand, it must be remembered that food loaf is only one of a number of punitive measures available to prison officials to curb such negative behavior. And, while the behavior at issue is relatively common, it is only one of a number of disciplinary problems which have combined of late to create an atmosphere of tension and violence within the segregation units. While the problem of food and waste throwing is certainly serious, it is not as serious as, for example, the recurring problem of prisoner assaults on guards.

Finally, in evaluating the state interest at stake, I cannot disregard the clear evidence that food loaf has been unsuccessful in curbing this extremely negative behavior. The choice of a particular punitive measure, among constitutionally acceptable alternatives, is a matter to be left to the discretion of prison officials and, barring some constitutional difficulty, this Court may not substitute its judgment for that of the prison officials on such an issue, no matter how wrong-headed or ineffectual their chosen policies appear to be. *See, e.g., Hewitt v. Helms,* 459 U.S. at 470, 103 S.Ct. at 870–71; *Meachum v. Fano,* 427 U.S. at 225, 96 S.Ct. at 2538–39; *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1977). But in weighing the state's interest in imposing food loaf upon a prisoner, I think it does no violence to the doctrine of judicial deference to take notice of the fact that a chosen policy is, at best, ineffective, and at worst a contributing factor in the escalating tension within the segregation units. Thus, while the state interest in maintaining discipline and sanitation within the segregation units is great, its interest in using food loaf in order to achieve those goals is less weighty.

The private interest to be balanced against the state interest is also great. There can be no doubt that eating food loaf for an extended period of time is unpleasant. Further, given the severe restrictions already placed upon these prisoners, from restricted access to out-of-cell activities to restrictions upon the possession of personal property, it is also obvious that the food served to these prisoners takes on a significance for them that it might not have for prisoners in other settings. Finally, the Court cannot ignore the fact that the use of food as a punishment is disfavored, both by courts and by corrections experts themselves. *See, Moss v. Ward,* 450 F.Supp. 591, 594 (W.D.N.Y.1978); American Correctional Association Correctional Standard 2–4223–1 (January, 1988). This indicates a clear awareness of psychological impact food related punishments have upon prisoners, and of their strong interest in not being subjected to such punishments arbitrarily. Thus, I conclude that the state and private interests at stake are roughly equal. The prisoners' stake in not being deprived of regular meals is great, and while the state's interest in maintaining discipline and sanitary conditions in segregation units may be considered greater, the state's interest in imposing this particular sanction for misbehavior must be discounted because the sanctions appears to be so ineffectual.

■ Although I have concluded that the private interest at stake is great, I do not find that it is so great as to require a prior hearing before the imposition of food loaf. To begin with, we must keep in mind that we are only talking about food, and a temporary deprivation of certain kinds of food at that. We are not considering far greater impositions upon liberty interests such as being placed in segregation or having one's parole revoked. Second, the state's argument that food loaf must be imposed quickly and consistently in order to be effective carries some weight. A prisoner who engages in food or waste throwing is highly likely to be agitated and violent. He is also likely to engage in that behavior again, at the very next opportunity. Even if food loaf is ineffective at preventing prisoners from throwing food or waste when they have the opportunity to do so, it must be considered effective at preventing that behavior, while the prisoner is on the food loaf diet, simply because it removes the prisoner's opportunity to engage in the

behavior. I find that the state's interest in removing that opportunity, at least temporarily, while the prisoner is most likely to repeat the behavior, outweighs the chance of an erroneous or arbitrary deprivation of the prisoner's right to receive regular meals.

■ What I do find objectionable about the present policy is the provision which allows the hearing officer to continue the food loaf punishment, even if that officer decides that the misconduct charge is unwarranted. This provision only makes sense if one continues to view food loaf as something other than a punishment. Once we admit that food loaf is a punishment for a particular type of misconduct, it appears clear that such a punishment cannot be imposed if the misconduct charge against the prisoner is without merit. To allow a hearing officer to impose this punishment, even though the misconduct charge must be dismissed for "procedural reasons," so increases the possibility of arbitrary punishment and erroneous deprivations that it must be held to violate the prisoners' due process rights. Either the prison is justified in punishing a prisoner for misconduct or it is not. But it cannot find the prisoner innocent of misconduct, or find that the charge filed against the prisoner must be dismissed, and also punish him. Such an alternative raises to an unacceptable level the prospect of arbitrary government action, the very prospect which the due process clause seeks to avoid. *See, Walker,* 558 F.2d at 1257.

To conclude, I find that the use of food loaf does not violate the Consent Decree or the State Plan for Compliance. I further find that it does not, in all cases, constitute cruel and unusual punishment within the meaning of the Eighth Amendment. I further find that Policy Directive PD–BCF–50.04 confers a liberty interest on prisoners in not being placed on food loaf unless they have engaged in the behavior identified in that policy. While the private interest at stake is great, it is not so great as to require defendants to conduct a disciplinary hearing prior to the imposition of food loaf upon a particular prisoner. I do find,

however, that the policy directive, as currently written, violates the due process rights of prisoners in segregation units to the extent that it permits the use of food loaf as a punishment even when the misconduct charge upon which that punishment is based has been dismissed. Thus, I will enjoin the use of food loaf as a punishment for misconduct in any case where the misconduct charge upon which that punishment is based is dismissed by the hearing officer, for whatever reason, or where the hearing officer finds the prisoner not guilty of the misconduct as charged.

