McCALLUM v DEPARTMENT OF CORRECTIONS

Docket No. 127000. Submitted March 3, 1992, at Lansing. Decided
December 21, 1992, at 10:15 A.M. Leave to appeal sought.

William McCallum, for himself and as personal representative of
the estate of Josephine C. McCallum, deceased, and as guardian
of Michael J. McCallum, a minor, brought an action in the
Ingham Circuit Court against the Department of Corrections,
Robert Brown, Jr., Dale Foltz, John Whelan, and others, alleg-
ing claims under the state Civil Rights Act against all the
defendants, and under the federal Civil Rights Act against
Foltz and Whelan. The action sought damages resulting from
the wrongful death of the decedent, a probationary corrections
officer, who was killed by a prisoner, and for sexual harass-
ment. The court, Peter D. Houk, J., granted summary disposi-
tion for the defendants. The plaintiff appealed.

The Court of Appeals *held:*

1. The evidence does not support the plaintiff's claim that the
decedent was assigned to the gate area where the incident
occurred because of quid pro quo sexual harassment.

2. The evidence does not support a cause of action for
wrongful death due to hostile-environment sexual harassment.
There is no evidence that the decedent ever felt that her work
performance was substantially and adversely affected by a
hostile environment.

3. The testimony discloses that the decedent was harassed by
Sergeant John Rakowski. Summary disposition was improperly
granted on the basis that the plaintiff failed to provide admissi-
ble evidence to support the claim of quid pro quo sexual
harassment by Rakowski. To the extent that various deposed
witnesses testified that they heard Rakowski make certain
statements to the decedent, the depositional testimony con-

REFERENCES

Am Jur 2d, Evidence §§ 497, 650; Job Discrimination §§ 789-793,
801-806.

When is work environment intimidating, hostile, or offensive, so as
to constitute sexual harassment in violation of Title VII of Civil
Rights Act of 1964, as amended (42 USCS secs. 2000e et seq.). 78
ALR Fed 252.

cerned admissions of a party opponent, which are not hearsay and are admissible. Those remarks reasonably could be interpreted as sexual harassment and support the plaintiff's theory of quid pro quo sexual harassment. The decedent's state of mind is at issue in determining whether she was the subject of sexual harassment and what her reaction to the harassment was. Therefore, certain statements the decedent made to others regarding quid pro quo sexual harassment by Rakowski are admissible under MRE 803(3). The trial court's order regarding the claim of quid pro quo sexual harassment against Rakowski must be reversed and the case remanded for trial.

4. There was insufficient evidence presented to raise material issues of fact with regard to the federal civil rights and equal protection claims against Foltz or Whelan. In addition, Foltz and Whelan cannot be held liable for quid pro quo sexual harassment by Rakowski, their subordinate employee, because there is no evidence that they directly participated in, encouraged, or knew about Rakowski's alleged sexual harassment of the decedent. The court correctly ruled that the decedent's right to due process and equal protection under federal law was not violated.

Affirmed in part, reversed in part, and remanded.

1. CIVIL RIGHTS — SEXUAL HARASSMENT IN THE WORKPLACE.

The state and federal Civil Rights Acts recognize two types of sexual harassment in the workplace: quid pro quo harassment, which requires that an employee either accede to sexual demands or forfeit job benefits and perquisites or otherwise be subject to less favorable working conditions; and hostile work environment harassment, which is unwelcome sexual conduct in the workplace that unreasonably interferes with an employee's work performance or creates an intimidating, hostile, or offensive employment environment (42 USC 1983; MCL 37.2101 *et seq.*; MSA 3.548[101] *et seq.*).

2. CIVIL RIGHTS — SEXUAL HARASSMENT IN THE WORKPLACE — REASONABLE WOMAN STANDARD.

In an action by a woman alleging either quid pro quo or hostile work environment sexual harassment, the offensiveness of the claimed conduct should be viewed from the perspective of a "reasonable woman" rather than from that of a "reasonable person."

3. CIVIL RIGHTS — SEXUAL HARASSMENT IN THE WORKPLACE — HOSTILE WORK ENVIRONMENT.

A claim of hostile work environment sexual harassment under

the Civil Rights Act requires an allegation that both the employer and the employee knew of the sexual hostility; there must be some affirmative manifestation of the hostile work environment to the complaining party, and the sexual hostility becomes actionable only when sufficiently severe and persistent to affect seriously the psychological well being of the employee in question; the employee's work performance must be substantially and adversely affected by the hostile environment (MCL 37.2101 *et seq.*; MSA 3.548[101] *et seq.*).

4. Evidence — Hearsay Exceptions — Statements of Existing Mental, Emotional, or Physical Condition.

A statement of the declarant's then existing mental, emotional, or physical condition may be admissible pursuant to an exception to the hearsay rule only when the state of mind of the declarant is at issue (MRE 803[3]).

5. Civil Rights — Sexual Harassment in the Workplace — Master and Servant.

Supervisory officials cannot be held liable for sexual harassment by subordinate employees unless the supervisor either encouraged the misconduct or in some way directly participated in it.

*Steven J. Vander Ark,* for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Stewart H. Freeman, Margaret A. Nelson,* and *Thomas R. Wheeker,* Assistant Attorneys General, for the defendants.

Before: Marilyn Kelly, P.J., and McDonald and G. S. Allen,* JJ.

G. S. Allen, J. In this wrongful death and sexual harassment action, plaintiff appeals as of right from a March 1, 1990, order of the Ingham Circuit Court granting summary disposition under MCR 2.116(C)(10) to defendants. More than thirty depositions and hundreds of exhibits establish the following relevant facts.

Josephine McCallum, age twenty-seven, wife of

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

William C. McCallum and mother of Michael Mc-Callum, age nine, began her career as a corrections officer for the Department of Corrections (DOC) in October 1986. She completed her on-the-job training in January 1987, graduated from the Correction Officers Academy on February 7, 1987, and was first assigned to duty on the 6:00 A.M. to 2:00 P.M. shift at the State Prison of Southern Michigan (SPSM) Central Complex. The assignment required her to begin each day working in the cafeteria dining room under the supervision of Sergeant John Rakowski.

About one week before her death on March 24, 1987, McCallum complained to several of her academy classmates that she was having problems with Rakowski. She told Brenda Wilson that Rakowski wanted to go out with her socially after work, that he "had the hots for her," that she did not like it, and that it became more irritating as time went on. She asked academy classmates Wilson and Steve Horn to join her whenever they saw Rakowski engaging her in conversation. She explained that Rakowski did not want other people around when he was talking to her.

Steve Horn explained that McCallum asked him to intervene because Rakowski was "bullshitting her" about all the power he had and how he could help her out or could keep people from going anywhere in the department. Horn stated that he did not recall that McCallum ever said anything about Rakowski asking to go to bed with her, but according to Horn, "You would have to be a blind man not to see that that's what he was getting at."

McCallum complained to classmate Lynda Gradoville about the rotten dining room assignments Rakowski gave her and that Rakowski kept asking her for a date or a drink after work, but nothing

else of a sexual nature was mentioned. At breakfast on March 23, 1987, McCallum complained to Officer Pamela Williams Jacobson that a particular sergeant was coming on to her real strong, kept asking her for dates, and was giving her bad assignments. That evening, McCallum told her husband that Rakowski was continually harassing her and wanted to go to bed with her, and that if she did not give in to him she would be on her own.

In the dining room on the morning of March 24, 1987, McCallum told Brenda Wilson "she was not going to take any more of his [Rakowski's] shit" and was going to report him even if it meant she might lose her job. Then Captain Douglas McMurtrie changed McCallum's work assignment from 6 Block to the JCC gate post because the officer assigned to the gate post that morning had called in sick. Rakowski and McMurtrie were social friends who often attended after-work parties together. Shift assignments were routinely prepared a week in advance, but changes such as occurred on March 24 were not unusual and were made when the assigned person called in sick or an emergency arose.

McCallum's movements on the morning of her death were as follows. Upon arriving for work on March 24, McCallum was first assigned to the dining hall for inmate breakfast from 6:00 A.M. to 7:30 A.M. Upon leaving the dining hall, McCallum proceeded to walk to the JCC gate located adjacent to the commissary dock area. At approximately 6:30 A.M. on March 24, inmate Edward Clay Hill, serving eighteen to forty years for manslaughter and rape, reported to work at the commissary dock. His supervisor was Robert Follick. Follick observed that Hill appeared to have been drinking, refused to help unload a truck, and even made

threatening remarks to him. Nevertheless Hill was allowed to remain in the commissary dock area.

At about 7:20 A.M., a second truck arrived at the commissary dock. In the truck was Sabrina Johnson, an on-the-job training officer, and the driver, Charles Eddy, a sixteen-year veteran with the DOC. As Eddy and Johnson unloaded the truck, Hill approached and began asking questions of Johnson, who could smell the odor of liquor on Hill's breath. Follick also noticed that Hill appeared to be pressing his body close to Johnson and she appeared to be trying to stay away from him. At approximately 7:40 A.M., Johnson got back into the passenger side of the truck and, while the door was still open, Hill ran his fingers alongside Johnson's thigh and buttocks. Johnson quickly pushed Hill's hand away, closed the door, and the truck drove off. As the truck pulled away, Eddy and Johnson saw McCallum walking by; through the rearview mirror, Eddy observed McCallum entering the door to the JCC gate followed by two black inmates.

Exactly what happened next is not known. Either by a forged pass or by verbally misrepresenting his identity, Hill persuaded McCallum to allow him to pass through the gate and enter the auditorium with her. There, within the next fifteen minutes, McCallum was severely beaten, raped, and strangled. Her body was dragged across the stage and dumped at the bottom of an unlighted stairwell. As a result of her death, McCallum's family will receive workers' compensation death benefits over a five-hundred-week period.

Josephine McCallum's violent death triggered a series of departmental and intradepartmental investigations. Among the results of these investigations were: (1) a report authored by Joseph Abramajtys and John Elkins based on their investiga-

tion of the policies and operating practices of the
SPSM Central Complex conducted between April
and June 1987; (2) a follow-up action plan pre-
pared by Dan Bolden, Deputy Director of the
Bureau of Correctional Facilities; (3) an investiga-
tive report on the sexual harassment complaint of
William McCallum prepared by Cindy Lindemyer,
security investigator, and submitted to Warden
John Jabe on November 18, 1987. The trial court
declined to admit reports 1 and 2. Report 3 was
made a part of the deposition of Cindy Lindemyer.
Additional facts, as needed, are found in the dis-
cussion of the issues.

Plaintiff's amended complaint, filed on February
17, 1988, states claims under the state Civil Rights
Act[1] against the Department of Corrections (count
I), Robert Brown, Jr., Director of the Department
of Corrections (count II); Dale Foltz, Warden of the
SPSM (count III); and John Whelan, Deputy Warden
of the SPSM (count IV). Separate claims were stated
under title VII of the federal Civil Rights Act[2]
against Dale Foltz (count V) and John Whelan
(count VI).

Discovery commenced and thirty-one depositions
were taken, interrogatories exchanged, and hun-
dreds of documents produced. On September 19,
1989, defendants moved for summary disposition
pursuant to MCR 2.116(C)(10). Oral argument was
heard on December 4, 1989, and on March 1, 1990,
the trial court issued its comprehensive and de-
tailed opinion granting defendants' motion.

The doctrine of governmental immunity pre-
cludes suit against the DOC on grounds of tort.
MCL 691.1407(1); MSA 3.996(107)(1); *Wade v Dep't
of Corrections,* 439 Mich 158, 166; 483 NW2d 26
(1992); *Ross v Consumers Power Co (On Rehear-*

---

[1] MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*
[2] 42 USC 1983.

*ing),* 420 Mich 567; 363 NW2d 641 (1984). However, plaintiff's suit is predicated on sexual harassment as that term is defined under the state Civil Rights Act, *supra,* and the federal Civil Rights Act, *supra.*

The state Civil Rights Act and title VII of the federal Civil Rights Act recognize two types of sexual harassment in the workplace: (1) quid pro quo harassment; and (2) harassment resulting from a hostile or offensive work environment. *Langlois v McDonald's Restaurants of Michigan, Inc,* 149 Mich App 309, 312-313; 385 NW2d 778 (1986); *Rabidue v Osceola Refining Co,* 805 F2d 611, 618 (CA 6, 1986); *McCalla v Ellis,* 180 Mich App 372, 377; 446 NW2d 904 (1989). Quid pro quo harassment is that which requires that the employee either accede to sexual demands or forfeit job benefits and perquisites or otherwise be subject to less favorable working conditions. *McCalla, supra,* p 378. Hostile work environment harassment is unwelcome sexual conduct in the workplace that unreasonably interferes with an employee's work performance or creates an intimidating, hostile, or offensive employment environment. Both quid pro quo and hostile-environment type sexual harassment are measured under the reasonable woman standard set forth in *Radtke v Everett,* 189 Mich App 346, 353-354; 471 NW2d 660 (1991).

Plaintiff's amended complaint sets forth quid pro quo harassment by Rakowski and hostile workplace harassment by prison inmates. In addition, the amended complaint asserts that in retaliation for not going to bed with him or otherwise acceding to his sexual advances, Rakowski prevailed upon his friend, Captain Douglas McMurtrie, to have McCallum assigned to the alleged dangerous JCC gate where she could be further harassed by prison inmates. Because McCallum was killed at

the JCC gate, we first address the issue of retaliatory sexual harassment and next address the issues of workplace harassment by prison inmates and staff and quid pro quo harassment by Rakowski. Finally, we address the title VII federal claims.

## I. RETALIATORY HARASSMENT

The trial court rejected all claims that McCallum was assigned to the JCC gate for retaliatory reasons. The court relied on statistics disclosing that corrections officers were regularly assigned to the JCC gate regardless of their probationary status or their gender. Defendants' Index 10 discloses that in the month preceding McCallum's death, the JCC gate was manned nineteen times by male officers and six times by female officers. Of the nineteen male officers, five, like McCallum, were probationary officers. Further, as noted by the trial court, because male probationary officers were assigned to the position, the alleged harassment was not based on gender.

We agree with the trial court. There is no proof that Rakowski had anything to do with McCallum's assignment the day she was killed. Rakowski had no power to make assignments outside of the dining hall and, in fact, was not even present at the prison on March 24. Further, the proofs disclose that McCallum's assignment on March 24 was routine, and was necessitated by the absence that morning of the earlier assigned officer. Accordingly, even if, arguendo, sufficient evidence of quid quo pro sexual harassment was presented to raise a question of fact (see issue III, infra), plaintiff failed to present evidence of a nexus between such harassment and McCallum's assignment and death at the JCC gate. Consequently, plaintiff is

precluded from recovery on the theory that the death was caused by Rakowski's alleged quid pro quo sexual harassment.

## II. HOSTILE WORK ENVIRONMENT

Plaintiff also alleges that sufficient proofs were presented to at least raise a question of fact for the jury to determine whether there was pervasive hostile-environment sexual harassment on the part of the inmates at the prison and some prison staff, and whether McCallum was attacked and killed as a "direct, proximate and foreseeable result." The trial court rejected defendants' claim that as a matter of law defendants were insulated from liability for an inmate-originated "hostile environment," but granted summary disposition on the grounds that the evidence failed to show that such harassment was "so pervasive as to alter the conditions of employment" and that there was no showing that McCallum was ever aware of or complained of sexual harassment by inmates or guards other than Rakowski. The court further found that much of plaintiff's argument was based upon the Abramajtys-Elkins report, and ruled that the report was inadmissible hearsay on the basis of *Bradbury v Ford Motor Co,* 419 Mich 550, 554; 358 NW2d 550 (1984).

We agree with the trial court that the report is inadmissible under MRE 803(8)(B) and *Bradbury* as an exception to the hearsay rule. However, that determination is not decisive of the issue, because the contents of the report constitute admissions of a party opponent, and are therefore not hearsay in the first instance pursuant to MRE 801(d)(2)(D). That subrule provides:

A statement is not hearsay if—

\* \* \*

The statement is offered against a party and is
. . . a statement by his agent or servant concern-
ing a matter within the scope of his agency or
employment, made during the existence of the
relationship.

See, e.g., *People v Harajli,* 170 Mich App 794, 798;
428 NW2d 781 (1988); *Bradford v General Motors
Corp,* 123 Mich App 641, 648; 333 NW2d 109
(1983). Notwithstanding the admissibility of the
report, plaintiff has not shown sufficient facts to
support a cause of action for wrongful death due to
hostile-environment sexual harassment. The re-
port shows that McCallum's death was due to
shortcomings in security arrangements and the
fact that the JCC gate could not be secured prop-
erly by a single, insufficiently experienced, proba-
tionary officer, whether male or female. The report
does show that sexual harassment on the part of
the inmates, and to a lesser extent the guards, was
rampant at the prison, but does not show that
McCallum was aware of the incidents of harass-
ment described in the report or that she was
thereby affected. In short, the report shows that
McCallum's death was the result of negligence on
the part of the prison officials and guards—negli-
gence that is not actionable under the doctrine of
governmental immunity.

Unquestionably the proofs disclose a hostile en-
vironment. By its very nature a prison is a hostile
workplace. The record contains numerous exam-
ples of assaults on both male and female staff. But,
as stated in *Langlois, supra,* knowledge of the
sexual hostility by both the employer and the
employee is a key requisite.

A hostile environment cannot stand as such a

barrier until there is some affirmative manifestation of it to the complaining party or parties, and then becomes actionable *only when "sufficiently severe and persistent to affect seriously the psychological well being" of the employees in question. [Id., p 317.]*

The record is devoid of any complaint by McCallum of inmate sexual harassment or sexual harassment by corrections staff other than Rakowski. McCallum clearly understood her right to issue a misconduct report upon being assaulted. She issued such a report on February 17, 1987, when an inmate grabbed her by the crotch. Except for that single incident, nothing in the record shows that McCallum ever felt that her work performance was substantially and adversely affected by an inmate-created hostile environment during her seven weeks of employment at the Central Complex. Although she complained of harassment by Rakowski, she never complained of harassment by inmates or other staff aside from the single incident on February 17.

According to plaintiff, evidence that McCallum was grabbed by the crotch in February 1987 is in itself sufficient evidence to support a finding of hostile work environment. In support of this claim, plaintiff strongly argues that our Court's recent opinion in *Radtke, supra,* overruled *Langlois,* and in its place held that a single incident may, under some circumstances, support a finding of employer-created hostile work environment. The *Radtke* panel also rejected the "reasonable person" standard of *Langlois* and prior opinions and substituted the "reasonable woman" standard, which this Court opined would ensure a gender-conscious review of sexual harassment.

*Radtke* involved a single sexual assault on a Sunday afternoon in an animal hospital by a male

veterinarian against a female veterinary technician. The trial court granted summary disposition for the defendants on the ground that a single incident was not sufficient to state a cause of action for sexual harassment resulting from a hostile work environment. The *Radtke* panel reversed, ruling:

> [A] female plaintiff states an actionable claim for sex discrimination caused by hostile-environment sexual harassment under the state Civil Rights Act where she alleges conduct of a sexual nature that a reasonable woman would consider to be sufficiently severe or pervasive to alter the conditions of employment by substantially interfering with her employment *or* by creating an intimidating, hostile, or offensive employment environment. Under this standard, the required showing of the severity of the harassing conduct will vary inversely with the pervasiveness of the conduct under the totality of the circumstances. [*Radtke, supra,* pp 355-356; emphasis supplied.]

We find *Radtke* distinguishable. In that case, normally law-abiding citizens were employed under nonhostile conditions and in a nonhostile environment. This case, on the other hand, involves people who must be confined because they are unable to be law-abiding and who live in an inherently hostile environment. Although we have no quarrel with the "reasonable woman" standard adopted by *Radtke,* we decline to apply the single-incident theory to a prison setting so as to abolish the need for complaining parties to establish that their work performance was substantially affected by the inmates' conduct.

### III. QUID PRO QUO CLAIM

We turn now to the question whether the trial

court erred in holding that plaintiff presented insufficient proofs to raise a question of fact concerning quid pro quo sexual harassment by Rakowski. In resolving issue I, *supra,* we held that because plaintiff failed to establish a nexus between such harassment, if established, and McCallum's slaying at the JCC gate, plaintiff is precluded from receiving any damages for wrongful death. However, if sufficient evidence is presented to raise a question of fact with regard to quid pro quo harassment by Rakowski, plaintiff would at least be entitled to a trial and possibly to damages for injury thereby sustained by McCallum before her death.

We have carefully examined the extensive deposition testimony and exhibits relevant to this issue. The testimony unequivocally discloses that McCallum was harassed by Rakowski to the point that on the morning of March 24 she stated she no longer would take any more of "this shit" and would file a complaint even if it meant the end of her career with the DOC. But the testimony is conflicting, or at least ambiguous, regarding whether "this shit" referred to sexual advances, other disagreeable dining room conduct, or a combination of both. To Brenda Wilson, McCallum voiced displeasure at the rotten assignments handed her by Rakowski as well as his repeated requests for dates. Officers Gradoville and Horn reported incidents of Rakowski making unreasonable decisions regarding inmate seating in the dining hall. However, when closely questioned, Wilson disclaimed that McCallum ever said that having sex was a condition of job advancement. Horn did not recall McCallum ever stating that Rakowski wanted to go to bed with her, but Horn did state, "You would have to be a blind man not to see that that's what [Rakowski] was getting at."

The trial court rejected plaintiff's claim of quid pro quo sexual harassment primarily on the ground that plaintiff failed to provide *admissible evidence* thereof. As stated by the court:

> Simply stated, Plaintiff has presented a claim based upon inference predicated upon hearsay.

Inadmissible hearsay does not create a genuine issue of fact. *Amorello v Monsanto Corp,* 186 Mich App 324, 329; 463 NW2d 487 (1990); *Pauley v Hall,* 124 Mich App 255, 262; 335 NW2d 197 (1983).

On appeal, plaintiff contends that the deposition testimony of what McCallum said to her fellow officers is admissible under MRE 801(d)(2) as admissions by a party opponent, and under MRE 803(3) to show McCallum's state of mind.

MRE 801(c) defines hearsay as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay evidence is not admissible at trial unless it falls within an established exception; exceptions to the hearsay rule are justified by the belief that the hearsay statements are both necessary and inherently trustworthy. *People v Meeboer (After Remand),* 439 Mich 310, 322; 484 NW2d 621 (1992).

To the extent that various deposed witnesses testified that they heard Rakowski make certain statements to McCallum, the depositional testimony concerns admissions of a party opponent, which are not hearsay in the first instance and are admissible. *In re Estate of Hutton,* 191 Mich App 292, 295; 477 NW2d 144 (1991). These overheard remarks reasonably could be interpreted as sexual harassment and, as such, to support plaintiff's quid pro quo sexual harassment theory. This is so in view of the backdrop against which they were

made, i.e., a prison described, by several deposed witnesses as well as in the report (discussed under issue II), as teeming with inmates and guards who frequently engaged in sexually inappropriate behavior.

However, the testimony of other deposed witnesses who relate what McCallum told them Rakowski said or did to her is classic hearsay as defined above, and is not admissible unless it falls under an established exception to the hearsay rule.

In this regard, plaintiff contends that the remarks McCallum made to her husband the evening before her death fall under the excited utterance exception, MRE 803(2). This exception serves to render admissible statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." However, plaintiff does not point to any startling event that occurred on March 23. What's more, our review of the record reveals that McCallum complained about Rakowski for at least a week before her death on March 24, and that she had been bothered about it all during that time. We conclude that the excited utterance exception does not apply under these facts. *Berryman v K mart Corp,* 193 Mich App 88, 100-101; 483 NW2d 642 (1992).

Plaintiff also contends that McCallum's statements to various people indicating that she was afraid that if she did not accede to Rakowski's demands she would be "on her own" at the prison and that she was irritated at Rakowski for continuing in his demands and intended to report him are admissible under the hearsay exception set forth in MRE 803(3), which excepts from the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to . . . declarant's will.

Such statements are admissible only when the state of mind of the declarant is at issue. See, e.g., *Duke v American Olean Tile Co,* 155 Mich App 555, 571; 400 NW2d 677 (1986). In this case, McCallum's state of mind is at issue in determining whether she was the subject of unwelcome sexual harassment and what her reaction to the harassment was. *McCalla, supra,* p 378.

Accordingly, summary disposition was improperly granted with regard to plaintiff's claim of quid pro quo sexual harassment by Rakowski.

### IV. 42 USC CLAIMS

Counts v and vi of the amended complaint add Dale Foltz and John Whelan as defendants and allege that, acting under color of state law, these defendants deprived McCallum of the equal protection and due process of law guaranteed her by the Constitution of the United States and 42 USC 1983.

In support of the equal protection claim, plaintiff repeats the allegations of work-environment and quid pro quo sexual harassment set forth in the state Civil Rights Act claims (counts i-iv). Plaintiff's equal protection claim under federal law must fail to the same extent and for the same reasons as did the claims under the state Civil Rights Act. As noted earlier, except for the quid pro quo claim concerning Rakowski, insufficient

admissible evidence was presented to raise material issues of fact.

Further, even the quid pro quo sexual harassment claim regarding Rakowski must fail against added defendants Foltz and Whelan. Supervisory officials cannot be held liable for sexual harassment by subordinate employees unless the supervisor either encouraged the misconduct or in some way directly participated in it. *Poe v Haydon,* 853 F2d 418, 429 (CA 6, 1988). Nothing in the record shows that Foltz or Whelan directly participated in, encouraged, or even knew about Rakowski's alleged sexual harassment of McCallum.

Plaintiff's due process claim is premised upon separate theories of liability neither of which was addressed under the state Civil Rights Act and neither of which relates to the gender of McCallum. First, plaintiff asserts that McCallum's death was the result of a violation of DOC policy. Specifically, plaintiff contends that McCallum's assignment, as a probationary officer to the JCC gate, an isolated single-officer position, was a violation of Policy Directive PD-DWA-04.01. That policy reads in part:

> During the remaining eighteen weeks of the probationary training period, the new employee will be assigned to both morning and afternoon shifts at their specific institutions. *While on probation, new employees will only be assigned duties or to areas that have direct access to supervisory personnel or experienced employees.* [Emphasis supplied.]

Citing *Parate v Isibor,* 868 F2d 821 (CA 6, 1989), the trial court dismissed the claim on the ground that a failure to follow a departmentally established policy does not state a cause of action

pursuant to 42 USC 1983. Relying on *Newsom v Norris,* 888 F2d 371 (CA 6, 1989), *Thompson v Commonwealth of Kentucky, Dep't of Corrections,* 833 F2d 614 (CA 6, 1987), rev'd 490 US 454; 109 S Ct 1904; 104 L Ed 2d 506 (1989), and *United States v Michigan,* 680 F Supp 270 (WD Mich, 1988), plaintiff contends that failure to follow a mandated departmental policy may be violative of 42 USC 1983.

We find that the trial court erred in relying on *Parate,* but correctly ruled that no due process right was violated. The holding in *Parate* was based upon *Washington v Starke,* 855 F2d 346 (CA 6, 1988), a case involving a discretionary policy. Where a departmental policy is of a mandatory nature, rather than discretionary, a protected right may arise. The cited policy directive was mandatory in this case, and the proofs establish that Foltz and Whelan were aware that both male and female probationary officers were routinely assigned to the JCC gate.

Nevertheless, deposition testimony overwhelmingly discloses that the policy was not violated. Officers Bolden, Linda Verlin, Robert Brown, Jr., and Foltz specifically stated that assignment to the JCC gate was not a violation of policy, and, in fact, was routinely ordered for both male and female probationary officers. Only Robert Hamlich, a union representative, stated that the assignment was potentially dangerous and required a more experienced officer. But Hamlich admitted on cross-examination that he didn't know whether such an assignment violated departmental policy, and that it wasn't even an issue within the union. Not until the release of the Abramajtys-Elkins report and Bolden's follow-up action plan in late June 1987, three months after McCallum's death, did it become clear that McCallum's assignment to the JCC

gate represented a violation of the spirit and intent of department policy.

In conclusion, plaintiff has failed to show that a record might be developed that would leave open an issue upon which reasonable minds might differ,[3] except with regard to the claim of quid pro quo sexual harassment by Rakowski. With regard to that claim, the order of the trial court is reversed and the matter remanded to the trial court for trial on the merits. If such harassment is established, plaintiff's estate is entitled to damages suffered by McCallum before her death. In all other respects the order of the trial court is affirmed.

Affirmed in part, reversed in part, and remanded.

[3] *Hutchinson v Allegan Co Bd of Road Comm'rs (On Remand),* 192 Mich App 472, 480-481; 481 NW2d 807 (1992).