*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF MARI ZIMMERMAN-
THOMPSON, by SPERRY L. MEGERIAN,
Personal Representative,

      Plaintiff-Appellee,

v

UNITED SERVICES AUTOMOBILE
ASSOCIATION,

      Defendant-Appellant.

UNPUBLISHED
April 18, 2019

No. 336483
Bay Circuit Court
LC No. 15-003782-CK

Before: SWARTZLE, P.J., and MARKEY and RONAYNE KRAUSE, JJ.

SWARTZLE, P.J. (*concurring in part, dissenting in part*).

I concur with regard to the majority's resolution of the umbrella policy in Part V. With regard to the majority's resolution of the main automobile policy in Part VI, I respectfully dissent.

Thought experiments can be enlightening. They can illustrate how a society run by philosopher-kings would devolve into a totalitarian nightmare, see Plato, *The Republic*, or how a public resource can be depleted in the absence of private property rights or other sound regulation, see Hardin, *The Tragedy of the Commons*, Science (1968). More concretely and relevant here, a thought experiment can crystallize the essence of an appeal like this one.

Based on the factual record, it is undisputed that this appeal presents a straightforward either/or proposition—either Mari Zimmerman-Thompson resided primarily with her husband Christopher Thompson at the Gleaner house, or she resided primarily with her son and daughter-in-law at the Stoneham house. There is no third option, unlike a situation where someone might have two homes in Michigan but spend the winter in Florida. Unless we are prepared to find that Mari resided nowhere, she had to reside somewhere, and the two options are the Gleaner house or the Stoneham house.

While the majority identifies several genuine issues of fact, I disagree that it has identified a genuine issue of *material* fact—i.e., where did Mari primarily reside? MCR 2.116(C)(10). As I read the record, there is no question about where and with whom Mari resided. First, any deposition testimony about what someone might recall about Mari's purported intentions must be set aside as inadmissible hearsay. *McCallum v Dept of Corrections*, 197 Mich App 589, 603; 496 NW2d 361 (1992). Second, this was a second marriage for both Mari and Christopher, so it is quite unremarkable that each spouse would still own real property from a prior marriage, especially given the housing crisis of the late 2000s. This was not a marriage of convenience, but rather a marriage of love and affection in which the two spouses traveled together, entertained together, and lived together, as the majority aptly recognizes.

Third, it is also unremarkable that Mari would visit the Stoneham house several times during a typical week, given that Mari was not employed, the houses were within several miles of each other, her son and daughter-in-law lived at the Stoneham house, and she loved to garden—an activity that she performed at the Stoneham house, the Gleaner house, and several other locations. Fourth, Mari stored some items at the Stoneham house (and her son used some of these items), but many items of clothes, jewelry, furniture, artwork, and gardening equipment were located where she lived, i.e., the Gleaner house. Fifth, while she received some mail at the Stoneham house (again, unremarkable given that she used to live there and still owned it), when she sent and received holiday and birthday cards, it was from and to the Gleaner house.

Sixth and most importantly, over the past seven or eight years, Mari spent most of her evenings at the Gleaner house with Christopher. She seldom left Christopher to stay overnight alone in part because he had a history of seizures and other health problems. When she did stay at the Stoneham house, it was with Christopher and the couple stayed in, as her son described, the *guest* room. The last time that she stayed in the Stoneham house for an extended period was the autumn before the July 2015 accident, when she and Christopher stayed at the Stoneham house for a couple of weeks because the hardware floors at the Gleaner house were being sanded and refinished. And, as usual, the couple stayed together, and they stayed together in the Stoneham house's *guest* room.

So, the thought experiment is this—Imagine shortly before the accident in July 2015 that Mari had been asked under oath where and with whom she primarily resided, at the Gleaner house with her husband or at the Stoneham house with her son and daughter-in-law (in the *guest* room)? Is there really any question what her answer would have been? On this record, I conclude that there is not.

Accordingly, I respectfully dissent from the majority's holding with respect to the main automobile policy.


/s/ Brock A. Swartzle