MARGITA v DIAMOND MORTGAGE CORPORATION

Docket No. 91488. Submitted November 19, 1986, at Detroit. Decided
April 7, 1987.

Janet Margita and Robert T. Margita arranged for a mortgage on
their home to acquire money to purchase a second house, which
would be used as rental property. The mortgage loan was
arranged by Diamond Mortgage Corporation and the mortgagee
was Commerce Mortgage Corporation. The Margitas apparently
made timely payments on the mortgage, but soon began receiv-
ing phone calls and letters indicating their payments were late,
which continued even after repeated efforts to rectify the
problem. The Margitas claim that Walter Pytlak, on behalf of
Diamond Mortgage, used threatening, abusive, and profane
language during the phone calls. The activity continued over a
period of approximately two and one-half years, continuing for
six months after the Margitas filed suit against Diamond
Mortgage, Commerce Mortgage, and Pytlak in Macomb Circuit
Court. Plaintiffs alleged that defendants had intentionally in-
flicted emotional distress, violated the collection practices act,
and negligently maintained plaintiffs' mortgage account. The
court, George R. Deneweth, J., granted summary disposition in
favor of defendants, finding that there was no genuine issue as
to any material fact and that defendants were entitled to
judgment as a matter of law because the mortgage proceeds
were intended to purchase income-producing property and the
collection practices act does not apply to such loans for business
purposes. The court also concluded that, while defendants'
conduct was in bad taste and obviously offensive, it was not so
extreme and outrageous as to support a recovery for inten-
tional infliction of emotional distress. Plaintiffs appealed.

The Court of Appeals *held:*

REFERENCES

Am Jur 2d, New Topic Service, Consumer and Borrower Protection
§§ 144 *et seq.*

Am Jur 2d, Torts §§ 17 *et seq.*

Modern status of intentional infliction of mental distress as inde-
pendent tort; "outrage". 38 ALR4th 998.

Validity, construction, and application of state statutes prohibiting
abusive or coersive debt collection practices. 87 ALR3d 786.

1. Issues of fact upon which reasonable minds might differ were presented on all four elements which make up a prima facie claim of intentional infliction of emotional distress. Summary disposition was therefore inappropriate as to plaintiffs' intentional infliction of emotional distress claim.

2. Summary disposition on plaintiffs' claim of violation of the collection practices act was properly granted. The collection practices act applies only to loans made primarily for personal, family, or household purposes. The mortgage loan involved herein was made exclusively for a business purpose.

Affirmed in part, reversed in part and remanded for further proceedings.

1. TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Four elements make up a prima facie claim of intentional infliction of emotional distress: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress.

2. TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS — EXTREME AND OUTRAGEOUS CONDUCT.

The extreme and outrageous character of conduct necessary to support a cause of action for intentional infliction of emotional distress may arise from the position of the actor or a relationship to the distressed party, i.e., it may occur through an abuse of a relationship which puts the defendant in a position of actual or apparent authority over a plaintiff or gives a defendant power to affect a plaintiff's interest.

3. TORTS — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS — EXTREME AND OUTRAGEOUS CONDUCT.

Whether a defendant's acts were sufficiently outrageous to support a cause of action for intentional infliction of emotional distress depends upon the context in which the defendant committed them.

4. DEBTOR AND CREDITOR — COLLECTION PRACTICES ACT.

The collection practices act, which prohibits various acts by licensed collection agencies in the collection of claims or debts or communications with debtors, applies only to loans made primarily for personal, family, or household purposes (MCL 339.901[a]; MSA 18.425[901][a]).

*Bleakley & McKeen, P.C.* (by *Scott L. Feuer*), for plaintiffs.

*Barron, Linden & Fagan, P.C.* (by *Stephen Linden*), for defendants.

Before: SHEPHERD, P.J., and WAHLS and SULLIVAN, JJ.

SHEPHERD, P.J. Plaintiffs filed suit on November 19, 1984, alleging that defendants had intentionally inflicted emotional distress, violated the collection practices act, MCL 339.901 *et seq.;* MSA 18.425(901) *et seq.,* and negligently maintained plaintiffs' mortgage account. The trial court granted summary disposition for defendants under MCR 2.116(C)(10). We affirm in part, but reverse with respect to the intentional infliction of emotional distress count.

The following facts are gleaned from the complaint, plaintiffs' depositions, and other material submitted with defendants' motions. Plaintiffs obtained a mortgage on their home on July 14, 1981, from defendant Commerce Mortgage Corporation. The loan was apparently arranged by defendant Diamond Mortgage Corporation.[1] The proceeds of this mortgage were apparently applied to the purchase price of a second house, which plaintiffs intended to rent. At all times, plaintiffs alleged that they made timely payments on the mortgage, and defendants do not appear to dispute this fact. Despite this, however, plaintiffs claim they soon began receiving phone calls and letters indicating their payments were late, which continued even after repeated efforts to rectify the problem. Plaintiffs also alleged that defendant Walter Pytlak, on behalf of Diamond Mortgage, used "threatening,

[1] It is not entirely clear what relationship defendants had after plaintiffs obtained the mortgage. It appears, however, that the majority of the mortgage collection efforts described in this opinion were carried out by Diamond Mortgage.

abusive, and profane language" during the phone calls.

In his deposition, plaintiff Robert Margita stated that Pytlak called plaintiffs at home "more than twenty times," often several times a week. Most calls were to Robert Margita. Some came in the morning and some "late at night," though apparently before 9:00 P.M. Pytlak's language in at least eight to ten of the calls was "insulting" and attacked Robert Margita's intelligence. On two occasions, at least, he called Margita "ignorant," "incompetent," "stupid," and used numerous profane words. Margita could not remember the details of other abusive conversations he alleged occurred. Pytlak insinuated "repossession of the house, of legal action against us." Plaintiffs also received dunning letters, at least one threatening them with foreclosure. At least one other representative of Diamond Mortgage called plaintiff about late payments, but did not use abusive, threatening or profane language. Margita repeatedly asked Pytlak not to call him. When he requested an audit of their account on several occasions, Pytlak told him Diamond Mortage's records already indicated plaintiffs were "in arrears and that it wouldn't be necessary." Year-end statements from the mortgage company indicated plaintiffs were paid up, but they were billed for numerous late fees.

Robert Margita indicated that he reacted with anger. The calls and letters were aggravating, and often got him and his wife "at each other's throats." He feared losing his home. He experienced loss of sleep and irritability on his job as a police officer after receiving the calls. He claimed to have missed up to twelve days of work. He also indicated that the emotional stress aggravated his asthma condition.

Plaintiff Janet Margita testified that plaintiffs always paid on time. The calls and letters began about six months after they got the mortgage. When she initially spoke to Pytlak, he checked the records and concluded it must have been a mistake. The letters and calls became more frequent, however, often on a monthly basis. She talked to Pytlak on several occasions or listened in on his conversations with her husband. Pytlak threatened foreclosure as a possibility. He told Janet Margita her husband was stupid, ignorant, and did not know what he was talking about, had no idea how financing a house mortgage worked, and he (Pytlak) really didn't want to talk about it any more in the future. At least twice, he called her husband "incompetent." Once Pytlak said "I don't know why I waste my time with you," and hung up. When speaking to Janet Margita, Pytlak was generally "more snotty" than abusive. He also used profane language to her. She was unable to remember the details of other abusive conversations. On one occasion, she went through a year's worth of receipts and checks with Pytlak over the phone and was told the problem must be at her end, rather than defendants'. Occasionally, plaintiffs would be told that it was all straightened out and there would be no more letters. Then the letters and calls would begin again, and the cycle would repeat. This continued for about two years. On two occasions, Pytlak told plaintiffs their account was being audited, but they received nothing other than year-end statements.

Janet Margita indicated that she became upset and the stress aggravated her problem with paroxysmal atrial tachycardia. She also experienced loss of sleep, and felt the calls and letters were a source of friction between the couple. She took several days off work, which she felt was necessi-

tated at least in part by the stress defendants induced.

The trial court file also contains copies of at least eighteen letters from Diamond Mortgage beginning in November, 1982, and ending in May, 1985, six months after plaintiffs filed suit, indicating that plaintiffs were past due on a mortgage payment and assessing a late charge. Eleven letters bear Pytlak's name. Some of the letters were apparently sent several months in a row. Most simply indicate that plaintiffs had to pay their mortgage payment plus the late fee to bring their "account back to a current status." One letter, signed by Jeff Saylor in August, 1984, describes itself as a "friendly reminder." Letters from Saylor in October, 1984, and January, 1985, indicating that twice the usual amount was due, closed with the admonition that "I trust that you will prevent the necessity of further action by giving this letter your personal attention." The May, 1985, letter, some six months after plaintiffs filed suit, was from an attorney and indicated that plaintiffs were two months in default and the file had been forwarded for foreclosure.

Defendants initially moved for summary disposition under MCR 2.116(C)(8), failure to state a claim. The trial court denied the motion, finding an adequate factual basis in their complaint for plaintiffs' claims. Defendants subsequently moved to dismiss plaintiffs' Count II, alleging intentional infliction of emotional distress, on the grounds that defendants' conduct was not so extreme and outrageous as to permit recovery. This motion was eventually expanded to include Count I, alleging violations of the collection practices act. The trial court treated the motion as one brought under MCR 2.116(C)(10), asserting that no disputed issue of material fact existed. The court concluded that,

based on plaintiffs' deposition testimony, the mortgage proceeds were intended to purchase income-producing property and that the collection practices act did not apply to such loans for business purposes. The court also concluded that, while defendants' conduct was "in bad taste and obviously offensive," it was not so extreme and outrageous as to support a recovery for intentional infliction of emotional distress. The court granted defendants' motion and dismissed plaintiffs' complaint.

A summary disposition motion under MCR 2.116(C)(10) should not be granted if a genuine issue exists as to any material fact. The test is whether the record which might be developed, giving the benefit of reasonable doubt to the opposing party, would leave open an issue upon which reasonable minds might differ. To grant summary disposition, the court must be satisfied that it would be impossible for the claim to be supported at trial because of some deficiency which cannot be overcome. *Tidwell v Dasher,* 152 Mich App 379, 383; 393 NW2d 644 (1986).

The Supreme Court recently addressed the tort of intentional infliction of emotional distress in *Roberts v Auto-Owners Ins Co,* 422 Mich 594, 597; 374 NW2d 905 (1985). Faced with a claim of intentional infliction of emotional distress arising from a denial of insurance benefits, the Supreme Court concluded that because the plaintiff "failed even to meet the threshold requirements of proof to make out a prima facie claim of intentional infliction of emotional distress, we are constrained from reaching the issue as to whether this modern tort should be formally adopted into our jurisprudence . . . ."

The *Roberts* Court, however, identified the four elements making up a prima facie claim: (1) ex-

treme and outrageous conduct, (2) intent or reck-
lessness, (3) causation, and (4) severe emotional
distress. 422 Mich at 602. The Court elaborated on
the first element:

> An oft-quoted Restatement comment summa-
> rizes the prevailing view of what constitutes "ex-
> treme and outrageous". conduct:
>
> "The cases thus far decided have found liability
> only where the defendant's conduct has been ex-
> treme and outrageous. It has not been enough that
> the defendant has acted with an intent which is
> tortious or even criminal, or that he has intended
> to inflict emotional distress, or even that his con-
> duct has been characterized by 'malice', or a de-
> gree of aggravation which would entitle the plain-
> tiff to punitive damages for another tort. Liability
> has been found only where the conduct has been
> so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds of
> decency, and to be regarded as atrocious, and
> utterly intolerable in a civilized community. Gen-
> erally, the case is one in which the recitation of
> the facts to an average member of the community
> would arouse his resentment against the actor,
> and lead him to exclaim, 'Outrageous!' "
>
> "The liability clearly does not extend to mere
> insults, indignities, threats, annoyances, petty op-
> pressions, or other trivialities. The rough edges of
> our society are still in need of a good deal of filing
> down, and in the meantime plaintiffs must neces-
> sarily be expected and required to be hardened to
> a certain amount of rough language, and to occa-
> sional acts that are definitely inconsiderate and
> unkind. There is no occasion for the law to inter-
> vene in every case where some one's feelings are
> hurt. There must still be freedom to express an
> unflattering opinion, and some safety valve must
> be left through which irascible tempers may blow
> off relatively harmless steam. [Restatement Torts,
> 2d, § 46, comment d, pp 72-73.]"
>
> Another Restatement comment further qualifies
> the conduct proscribed by this tort:

"The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress. [Restatement Torts, 2d, § 46, comment g, p 76.]" [422 Mich at 602-603.]

See also *Cebulski v Belleville,* 156 Mich App 190; 401 NW2d 616 (1986).

Panels of this Court have recognized the tort of intentional infliction of emotional distress in non-insurance contract cases. In *Ledsinger v Burmeister,* 114 Mich App 12, 17-21; 318 NW2d 558 (1982), a panel of this Court found that racial epithets in the course of throwing the plaintiff out of the defendant's retail store could be considered to be extreme and outrageous conduct under the circumstances. Similarly, in *Rosenberg v Rosenberg Bros Special Account,* 134 Mich App 342, 350-353; 351 NW2d 563 (1984), the Court found that allegations of twenty-six instances of misconduct when the defendant exerted his position over the widowed plaintiff to "browbeat" her into selling her business interests in her husband's estate could be sufficiently outrageous to state a claim.

The extreme and outrageous character of the conduct may arise from the position of the actor or a relationship to the distressed party. *Ledsinger, supra,* p 19. For example, it may occur through an abuse of a relationship which puts the defendant in a position of actual or apparent authority over a plaintiff or gives a defendant power to affect a plaintiff's interest. *Warren v June's Mobile Home Village & Sales, Inc,* 66 Mich App 386, 391; 239 NW2d 380 (1976). Whether a defendant's acts were sufficiently outrageous depends upon the context

in which the defendant committed them. *Rosenberg, supra,* p 353.

In the instant case, defendants' business involves lending money for mortgages. It appears undisputed that the debt defendants attempted to collect was not and has never been overdue. Despite this, defendants or their agents repeatedly harassed plaintiffs through abusive phone calls or letters assessing late charges. Foreclosure was apparently threatened on several occasions. Defendants obviously have a great deal of power to affect plaintiffs' credit rating and future borrowing ability. We believe defendants could have done nothing more outrageous in attempting to collect this imagined overdue debt, short of actually instituting foreclosure proceedings. It would be one thing if defendants were proceeding on a debt they had a right to collect. Even a few letters or phone calls to collect the not-yet-due debt might be viewed as a petty or trivial annoyance. Continuous unnecessary harassment over a nearly two-year period by a company whose main business is servicing such mortgages, however, might easily be viewed as extreme and outrageous conduct under the circumstances. It was a question for the trier of fact. See generally *Moorhead v J C Penney Co, Inc,* 555 SW2d 713, 717-718 (Tenn, 1977), a case involving repeated billings for a credit charge never incurred, and cases cited therein, and *Venes v Professional Service Bureau, Inc,* 353 NW2d 671, 674-675 (Minn App, 1984). See also, Anno: *Recovery by debtor, under tort of intentional or reckless infliction of emotional distress, for damages resulting from debt collection methods,* 87 ALR3d 201.

Intent or recklessness is suggested by the repetitive nature of the conduct even after plaintiffs requested that it stop or an accounting be made. In fact, as near as we can determine from informa-

tion submitted by defendants to the trial court, the letters continued after plaintiffs filed this suit. Plaintiffs' depositions and complaint contain numerous allegations of humiliation, anger, and similar feelings, such as fear of losing their home or damage to their credit rating, and physical complaints resulting from this emotional distress. The emotional distress was apparently causally related in time to the letters and phone calls. We believe that issues of fact have been presented on all four elements upon which reasonable minds might differ. Accordingly, summary disposition was inappropriate as to plaintiffs' intentional infliction of emotional distress claim.

We agree with the trial court's grant of summary disposition on plaintiffs' count alleging violation of the collection practices act, however. The act prohibits various acts by licensed collection agencies in the collection of claims or debts or communications with debtors. MCL 339.915 and 339.915a; MSA 18.425(915) and 18.425(915a). The act defines the claims and debts to which it applies:

> As used in this article:
> (a) "Claim" or "debt" means an obligation or alleged obligation for the payment of money or thing of value arising out of an expressed or implied agreement or contract for a purchase *made primarily for personal, family, or household purposes.* [MCL 339.901(a); MSA 18.425(901)(a). Emphasis added.]

The act took effect in 1980 and was amended in 1981. It has not been significantly interpreted by the courts of this state. In his deposition, however, Robert Margita testified that plaintiffs obtained the mortgage "to invest some money" by purchasing another home for rental. He characterized this

as for a "business purpose" rather than family or personal use. Janet Margita indicated that the mortgage proceeds were used for a down payment on "income property."

Without deciding whether the mortgage involved an "expressed or implied agreement or contract for a purchase" rather than a mere loan, we hold that the mortgage was not "made primarily for personal, family, or household purposes." It was made exclusively for a business purpose, even if plaintiffs are not in the real estate investment business. As plaintiffs admit, the loan was secured for an investment. We believe that the Legislature excluded such an exclusive business purpose from the act's coverage through its plain use of the language "primarily for personal, family, or household purposes." The act is thus directed at the nature of the transaction, not the persons involved.

We accept, as plaintiffs argue on appeal, that plaintiffs intended to use the excess of any return on their investment "to offset their living expenses" and to "aid them in providing for their future." Such personal, family, or household use of the proceeds of the investment is too remote to be included within the act's protections. As indicated, the act does not cover investment transactions even if the proceeds of an investment are to be used for personal purposes. Otherwise, the act would apply to a professional real estate investor who uses the fruits of business dealings to support a family. Thus, the trial court did not err in granting summary disposition on this count.

Affirmed in part, reversed in part, and remanded for further proceedings.[2]

---

[2] The trial court dismissed plaintiffs' complaint in its entirety. On appeal, plaintiffs have not argued that the court erred in dismissing

their third count, alleging negligence in maintaining plaintiffs' mortgage account. We do not decide that question.