Michelle PLUMB, Plaintiff,

v.

ABBOTT LABORATORIES, Kevin
Ruse, Defendants.

No. 97–CV–60306–AA.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 22, 1999.

Julia Sherwin, Detroit, MI, for plaintiff.

Camille S. Miller, Lewis & Munday, Detroit, MI, for defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEEH, District Judge.

This action arises out of plaintiff's charges of sexual harassment, disability

discrimination and intentional infliction of emotional distress under state law against her former employer and supervisor. Defendants removed on the basis of diversity jurisdiction. Now before the court is defendants' motion for summary judgment. On January 19, 1999, the court heard oral argument on the motion. For the reasons stated below, defendants' motion shall be granted.

## BACKGROUND

### A. Jurisdiction

Plaintiff originally filed her complaint, which alleges solely state law claims, in Monroe County Circuit Court. The original complaint named four defendants: (1) Abbott Laboratories, an Illinois corporation, (2) Ross Products, a Michigan corporation, (3) Kevin Ruse, an Ohio citizen, and (4) Tom Mack, an Ohio citizen. Defendants removed on the basis of diversity contending that Ross Products is not a separate

Michigan corporation but is merely a division of Abbott Laboratories (Abbott). The court ordered plaintiff to show cause whether complete diversity of citizenship did in fact exist. Plaintiff responded that the president of Ross Products, a Michigan corporation, had provided her with satisfactory documentation that it was not involved with Abbott or her employment. Thus, plaintiff dismissed Ross Products from the lawsuit and admitted that the court's exercise of diversity jurisdiction was proper. Defendant Mack was dismissed from this lawsuit by stipulation on October 19, 1998. The only remaining defendants are Abbott and Kevin Ruse and they have filed the joint motion for summary judgment addressed in this opinion.

### B. Alleged Sexual Misconduct

Plaintiff Michelle Plumb is a dietician who worked as a sales representative for defendant Abbott in its Ross Products Division beginning in 1986. Her responsibilities were to market Abbott's nutritional products to medical facilities such as hospitals and nursing homes. In 1994, plaintiff transferred her sales territory from the Grand Rapids area to the Northern Ohio area so that she and her husband and children could relocate to Monroe, Michigan in order to be near her parents and other family members. At the time of the transfer, plaintiff was required to interview with the Ross district manager in Ohio, Kevin Ruse, who later became her direct supervisor. Plaintiff's interview concluded successfully and plaintiff was allowed to relocate her sales territory to an area covering the region spanning from Cleveland to Northern, Indiana. She began covering the new territory in June, 1994.

According to plaintiff, her supervisor Ruse made several unwanted sexual advances towards her, and when those advances went unfulfilled, Ruse retaliated against her first by questioning and criticizing her job performance, and later, by refusing to accommodate her back injury. In terms of Ruse's alleged sexual advances, plaintiff accuses Ruse of leaving kissing sounds on her voice mail. She testified at her deposition that Ruse asked her how her husband felt about the sounds and she responded by asking him if his wife would approve. Plaintiff contends that after this conversation occurred, Ruse began questioning her business expense reports and accused her of charging personal matters to the company. Plaintiff also accuses Ruse of making sexual overtures to her by writing personal notes on sales invoices, including the following notes, which are attached as exhibits to plaintiff's response brief:

1. "Yo Baby"

2. "ALL MY LOVE, Kevin"

3. "Ooh! LET'S TALK ABOUT THE OPPORTUNITIES Ahead!"

4. "Love is in the Air, Kevin"

5. "Love, Kevin" within a heart and arrow drawn through it.

6. "What is the Potential? Love, Kevin"

(Plaintiffs Ex.1). Defendants do not contest the authenticity of the notes, but respond that Ruse made similar encouraging notes to all sales representatives, including both men and women, and thus, no sexual reference directed at plaintiff could be inferred. Plaintiff also contends that Ruse told her she was getting prettier with age. Ruse admits he made the statement in response to plaintiff's own statement that childbirth and cigarette smoking had diminished her appearance.

Plaintiff further claims that Ruse intimidated her by telling her about an incident where he physically assaulted a restaurant employee. Defendants claim that Ruse told the story to male and female representatives. She further claims that when she was driving Ruse in her car, he placed his head in her lap and pressed his hand on her foot, which was on the gas pedal, to accelerate the vehicle. Defendants contend that this incident, if it occurred, was meaningless, as Ruse stepped on male sales representatives' feet when they were driving as well in order to hasten their driving.

## C. *Plaintiff's Back Injury*

In April, 1992, plaintiff injured her back when lifting defendants' product out of her trunk. She took time off work, attended physical therapy and returned to work with no restrictions. On June 24, 1995, plaintiff claims she reinjured her back when lifting defendants' product into her vehicle. Plaintiff continued working until August, 1995 when she began treating for her back injury and began a three-month medical leave of absence.

## D. *Report of Sexual Harassment*

While on leave, plaintiff informed her employer's human resource manager Judy Stando that Ruse had sexually harassed her. Stando told plaintiff that she needed to file a written complaint for an investigation to be conducted, but plaintiff declined to so claiming she feared retribution from Ruse if she did so. Plaintiff specifically asked Stando not to pursue or investigate the matter. (Defendants' Ex. A at 138–41).

## E. *Plaintiff Returns to Work*

On November 20, 1995, plaintiff returned to work with the restriction that she not lift anything greater than 10 pounds and that she limit her sitting and driving times. As an accommodation to her medical restrictions, Abbott allowed plaintiff to ship product samples to her customers using United Parcel Service (UPS). Ruse contends that he had no knowledge of this accommodation, but plaintiff vigorously disputes this point. Plaintiff claims that Ruse later barred her from using UPS to ship product in retaliation for her rejection of his sexual overtures on January 25, 1996. On that date, plaintiff was scheduled to spend the night at a hotel where a district meeting was scheduled the next day because she lived more than 150 miles from the site. According to Ross policy, hotel accommodations were provided to sales representatives who lived more than 150 miles from a meeting location. Although Ruse lived within the 150 mile radius, he arranged to spend the night at the hotel and invited plaintiff to join him for dinner at the hotel the night before the event.

Feeling uncomfortable with what she perceived to be an invitation for a romantic encounter, plaintiff asked her husband to join them as he had been in the same area on business. Plaintiff met Ruse for dinner and after about twenty minutes, her husband arrived to join them. Plaintiff does not allege that Ruse made any untoward remarks nor does she contend that he asked her to sleep with him or to engage in any other type of sexual relations, however that word might be defined, during the time that they were alone. Plaintiff contends that Ruse's friendly demeanor disappeared, however, when her husband arrived. At the district meeting the next day, plaintiff contends that Ruse bragged to her about being thrown out of a strip bar, and sat underneath a table next to her

feet during a meeting. On February 1, 1996, plaintiff contends that Ruse told her he was uncomfortable with her husband joining them for dinner and told her that she could no longer ship via UPS as it violated company policy which required that representatives personally deliver product in order to encourage personal contact with customers. Plaintiff contends that Ruse ended Abbott's policy of allowing her to ship via UPS in retaliation for rebuking his advances.

Ruse told plaintiff to break down the cartons of containers, carrying small loads which weighed less than 10 pounds at a time. On February 14, 1996, Ruse sent all sales representatives a memo stating that no drop shipping of product, except those with his prior approval, would be allowed. On that same date, plaintiff's doctor faxed Ruse and Abbotts' human resources department a letter recommending that plaintiff be allowed to use UPS to deliver product to accommodate her back condition. Shortly thereafter, plaintiff quit working and began receiving worker's compensation again. On April 19, 1996, plaintiff submitted to an independent medical examination and the examining physician concluded that plaintiff was fit to return to work without restriction. On April 26, 1996, Ruse telephoned plaintiff to tell her that he heard she was returning to work. Plaintiff reported to work on April 29, 1996, but returned home allegedly due to back pain. Once again, she was placed on medical leave and received worker's compensation.

In early August, 1996, plaintiff was notified that if she did not report to work by August 18, 1996 she would be terminated based on the independent medical evaluation that she was fit for work, and the findings of a private investigator who had videotaped her carrying product on behalf of her husband's sales activities for an electronic parts manufacturer. Plaintiff did not return to work. Since leaving her employment for Abbott, plaintiff has not secured new employment but is attending Wayne State University part-time where she is working towards a physician's assistant degree. Plaintiff was formally terminated from her employment in November, 1996.

### F. *Plaintiff's Lawsuit*

In September, 1997, plaintiff filed a three-count lawsuit alleging sexual harassment under both the theory of hostile work environment and quid pro quo harassment in violation of the Michigan Elliott–Larsen Civil Rights Act (ELCRA) § 37.2101 *et seq.*, disability discrimination in violation of the Michigan Handicappers Civil Rights Act (MHCRA) § 37.1101 *et seq.*, and intentional infliction of emotional distress. Defendants have moved for summary judgment on all three counts. In terms of the sexual harassment claim, defendants contend that the conduct alleged does not amount to sexual harassment, and that even if it did, the conduct is not actionable because plaintiff asked defendants not to investigate her complaints. Defendants seek dismissal of plaintiff's disability discrimination claim on the grounds that plaintiff cannot show she is disabled as defined by the statute and even if she could, defendants provided her with a reasonable accommodation. Finally, defendants seek summary judgment on plaintiff's intentional infliction of emotional distress claim on the grounds that the conduct alleged does not rise to the extreme and outrageous level required for that tort to exist. Because summary judgment is warranted as to all counts of the complaint, the court does not reach defendants' argument that damages should be curtailed based on plaintiff's alleged failure to mitigate her losses.

### STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." *See FDIC v. Alexander,* 78 F.3d 1103, 1106 (6th Cir.1996). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Kutrom Corp. v. City of Center Line,* 979 F.2d 1171, 1174 (6th Cir.1992).

The standard for determining whether summary judgment is appropriate is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Winningham v. North Am. Resources Corp.,* 42 F.3d 981, 984 (6th Cir. 1994) (citing *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1310 (6th Cir.1989)). The evidence and all inferences therefrom must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Enertech Elec., Inc. v. Mahoning County Comm'rs,* 85 F.3d 257, 259 (6th Cir.1996); *Wilson v. Stroh Co., Inc.,* 952 F.2d 942, 945 (6th Cir.1992). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 774 (6th Cir.1996).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *see also Adams v. Philip Morris, Inc.,* 67 F.3d 580, 583 (6th Cir.1995).

Mere allegations or denials in the nonmovant's pleadings will not meet this burden. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Further, the nonmoving party cannot rest on its pleadings to avoid summary judgment. It must support its claim with some probative evidence. *Kraft v. United States,* 991 F.2d 292, 296 (6th Cir.), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

### ANALYSIS

#### I. *Sexual Harassment*

Under Michigan's anti-sexual harassment statute, a claim may be brought under two theories: hostile environment, M.C.L. § 37.2103(h)(iii), and quid pro quo harassment, M.C.L. § 37.2103(h)(i)(ii):

(h) Discrimination because of sex includes sexual harassment which means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when:

(i) Submission to such conduct or communication is made a term or condition either explicitly or implicitly to obtain employment ...

(ii) Submission to or rejection of such conduct or communication by an individual is used as a factor in decisions affecting such individual's employment ...

(iii) Such conduct or communication has the purpose or effect of substantially interfering with an individual's employment ... or creating an intimidating, hostile, or offensive .. environment.

M.C.L. § 37.2103(h). According to plaintiff's complaint, she seeks recovery for sex harassment under both theories. In defendants' brief in support of its motion for summary judgment, they argue that plaintiff's claim fails to meet the elements of a hostile environment claim.

In order to prevail under a theory of hostile environment, the plaintiff need

not show that she suffered any adverse employment action, such as denial of a promotion or discharge, but must show that the alleged conduct was intended to or did substantially interfere with her employment or "created an intimidating, hostile, or offensive work environment." *Radtke v. Everett*, 442 Mich. 368, 382–83, 501 N.W.2d 155, 162 (1993). In determining whether the alleged conduct substantially interfered with the plaintiff's work, the Michigan Supreme Court has held that an objectively reasonable standard should be used. *Id.* at 394, 501 N.W.2d at 167. In the analogous Title VII context, which Michigan courts have frequently looked to in applying Michigan's anti-harassment statute, the Supreme Court has held that a hostile work environment claim requires proof that the conduct complained of was so severe or pervasive that it would substantially interfere with a reasonable person's ability to perform their job. *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998), *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

■ In response to defendants' motion for summary judgment as to her sex harassment claim, plaintiff states that she is not seeking recovery under a hostile environment theory, but rather under the theory of quid pro quo harassment only. At oral argument, plaintiff's counsel reiterated that she was proceeding solely under the theory of quid pro quo harassment. Under that theory of liability, plaintiff need not show severe or pervasive conduct, but only that Ruse threatened or conditioned some aspect of her employment on submission to his sexual advances. *Champion v. Nationwide Sec.*, 450 Mich. 702, 708–09, 545 N.W.2d 596, 600 (1996). Because plaintiff concedes she does not seek recovery under a theory of hostile environment, the court limits its discussion here to plaintiff's claim of quid pro quo harassment.

■ In order to establish quid pro quo harassment, the parties agree that plaintiff must establish (1) that she was subjected to unwelcome sexual conduct or communication proscribed under the ELCRA, and (2) that her employer used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment. *Champion*, 450 Mich. at 708–09, 545 N.W.2d at 600. "[Q]uid pro quo harassment occurs only where an individual is in a position to offer tangible job benefits in exchange for sexual favors or, alternatively, [to] threaten job injury for a failure to submit." *Id.* at 713, 545 N.W.2d at 601. "Quid pro quo harassment is that which requires that the employee either accede to sexual demands or forfeit job benefits and perks or otherwise be subject to less favorable working conditions." *McCallum v. Department of Corrections*, 197 Mich.App. 589, 596, 496 N.W.2d 361, 365 (1992). The court addresses both elements of a quid pro quo harassment claim separately below.

A. *Unwelcome Sexual Advances*

■ In terms of the first element, plaintiff alleges that Ruse made unwelcome sexual advances by: (1) leaving kissing sounds on her voice mail, (2) leaving love notes on sales invoices, (3) placing his head in plaintiff's lap and his foot over hers on the gas pedal, (4) commenting that plaintiff was getting prettier with age, and (5) requesting that plaintiff meet him for dinner at the hotel where a business meeting was to be held the next day. Defendants do not dispute that the above incidents occurred, but contend that they were not sexual in nature and that Ruse treated all representatives, males and females alike, in the same manner. Defendants have submitted evidence that Ruse placed his foot on a male sales representatives foot while he was driving to accelerate his car. Plaintiff responds that no male sales representatives received kissing sounds on their voice mail or notes containing the word "love."

In support of its argument that Ruse's conduct was not harassing, defendants rely

on *Linebaugh v. Sheraton Mich. Corp.*, 198 Mich.App. 335, 497 N.W.2d 585 (1993) where the court dismissed plaintiff's sexual harassment claim which arose out of a co-worker's distribution of a cartoon depicting plaintiff and a male co-worker in a sexually compromised position, because the cartoon was equally offensive to men and women. While the offense to plaintiff, who was the laughing stock of the cartoon, would certainly be greater than that to the mere observer, the court found no harassment occurred where the employer promptly investigated the incident and issued warning to the worker's responsible for the cartoon. Defendants also cite *Walk v. Rubbermaid, Inc.*, 913 F.Supp. 1023 (N.D.Ohio 1994), *aff'd*, 76 F.3d 380, 1996 WL 56203 (6th Cir.1996), where the court dismissed plaintiff's sexual harassment claim because her supervisor's foul language was not gender based and he mistreated all his employees regardless of their sex. Both cases involved allegations of hostile environment harassment. In those cases, the courts found that while the conduct alleged may have been sexual in nature, it was simply not severe or pervasive enough to give rise to liability.

Analogizing to the cases cited above, defendants contend that Ruse was an eccentric and high-energy manager who offered all of the sales representatives under his direction encouragement in the form of intimate notes and speech. Unlike foul language spoken to a group or a racy cartoon circulated amongst employees generally, which was found not to be sex harassment in the cases cited by defendants, the conduct alleged in this case, including kissing sounds on her voice mail and love notes written on plaintiff's sales invoices, was directed only at plaintiff and not at employees as a whole. Moreover, the kissing sounds, love notes, and various comments reasonably could be construed as being of a sexual nature, or of being directed at plaintiff because she is a woman, whatever Ruse's stated subjective intent about those incidents in the course of this lawsuit.

The alleged conduct might reasonably be deemed to convey a sexual message as interpreted by plaintiff. However, plaintiff has not shown that any of Ruse's actions amounted to an invitation to engage in some sort of sexual activity with him, either explicitly or implicitly, which is really the essence of a quid pro quo claim. Even her contention that he asked her to dinner the night before a business meeting, without more, fails to give rise to an inference that he was sexually propositioning her. For two co-workers to dine together when they are both traveling in the same location on business is commonplace and the mere fact that one of the workers is a woman and the other is a man, standing alone, does not transform a business engagement into a romantic encounter. Had Ruse invited plaintiff to his hotel room for dinner via room service, the court's analysis would of course be different. But that is simply not the situation here. Moreover, at oral argument, plaintiff's counsel admitted that plaintiff and Ruse had dined alone on prior occasions without incident. Even at the dinner plaintiff complains of, Mr. Ruse is not claimed to engage in untoward conduct while the parties were alone.

█ Merely offensive sexual conduct which is not directed at an employee with the explicit or implicit understanding that fulfillment of a sexual proposition will lead to job benefits or that rejection of sexual advances will yield serious employment consequences, does not give rise to a quid pro quo claim, but rather, to a hostile environment claim. As discussed earlier, in that situation, the conduct must be pervasive or substantial for the claim to succeed. Having expressly abandoned her hostile environment claim here, however, this court need not evaluate whether the conduct alleged was so pervasive or severe that it substantially interfered with her employment. In the context of her quid pro quo claim, which does not require the same rigorous scrutiny of the conduct alleged, plaintiff's claim still must fail. Al-

though she has introduced facts supporting her position that Ruse made sexual remarks which she did not welcome, she has not shown that Ruse sexually propositioned her or that he offered her job benefits for sexual favors or threatened retribution should she decline to provide the same. Most significantly, as discussed below, plaintiff has failed to show that she suffered an adverse employment action for her failure to accommodate Ruse's alleged demand for sexual favors.

### B. *Tangible Adverse Employment Action*

The second and crucial element of a quid pro claim requires proof that by virtue of plaintiff's rejection of alleged sexual advances, she was subjected to an adverse employment action. *Champion,* 450 Mich. at 708–09, 545 N.W.2d at 600. The Michigan Elliott–Larsen Civil Rights Act does not define the phrase "adverse employment action" as it is used in the statute providing a cause of action for quid pro quo sexual harassment. Michigan case law, however, sheds some light on how severe an adverse employment decision must be before it serves to give rise to liability for quid pro quo harassment. Michigan courts generally have limited quid pro quo harassment to cases involving constructive discharge. *See e.g. Champion, Id.* at 710–12, 545 N.W.2d at 600–01 (constructive discharge arising out of rape by supervisor); *Chambers v. Trettco, Inc.,* 232 Mich.App. 560, 591 N.W.2d 413 (1998) (discharge). Short of discharge, there are few Michigan cases discussing quid pro quo harassment. *See e.g. Howard v. Canteen Corp.,* 192 Mich.App. 427, 434, 481 N.W.2d 718, 722 (1991) (transfer to less desirable position); *McCallum,* 197 Mich. App. at 598, 496 N.W.2d at 365 (alleged transfer to dangerous position where corrections officer was killed). Those quid pro quo cases involving employment decisions less serious than actual discharge still involved employment decisions far more serious than the ones alleged in the instant dispute.

In determining how significant an alleged adverse employment decision must be before liability arises, the court also turns to federal law in the related context of Title VII for guidance. Recently, the United States Supreme Court held that in order to hold an employer vicariously liable under Title VII for quid pro quo harassment of an employee by a supervisor, the employment decision at stake must be a "tangible employment action" which "constitutes a significant change in employment status, such as hiring firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998). The Court explained that a tangible employment action generally involves direct economic harm. *Id.* at 2269. Similarly, the Sixth Circuit has defined "quid pro quo" harassment in the context of Title VII as the loss of tangible job benefits:

> Quid pro quo sexual harassment is anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments. In a quid pro quo action, the employee bears the burden of proof to support charges that submission to the unwelcomed sexual advances of supervisory personnel was an express or implied condition for receiving job benefits or that a tangible job detriment resulted from the employer's failure to submit to the sexual demands of supervisory employees.

*Highlander v. KFC Nat'l Mgt. Co.,* 805 F.2d 644, 648 (6th Cir.1986).

█ In this case, the only alleged adverse employment actions were (1) Ruse's questioning of plaintiff's expense reports, and (2) Abbott's requirement that plaintiff adhere to stated company policy and deliver sample product personally. Plaintiff has not shown any nexus between these alleged adverse employment actions and

Ruse's alleged sexual advances. Even if she had, these actions simply do not rise to the level required to constitute a tangible job detriment. The actions alleged are minor and insubstantial. Plaintiff has not shown that she was demoted, that her benefits were cut, that her promotional opportunities were diminished, that her seniority or position were in any way jeopardized, or that she was economically harmed in any way by Ruse's alleged conduct. Plaintiff's argument that her employer's failure to allow her to ship via UPS resulted in her constructive discharge is simply not borne out by the facts of this case as explained in the court's discussion of plaintiff's handicap discrimination claim later in this opinion. Having failed to show that she suffered a significant adverse employment action in retaliation for rebuking Ruse's alleged sexual advances, plaintiff's quid pro quo harassment claim must be dismissed.

## II. *Handicapper Discrimination Claim*

### A. *Plaintiff has failed to show that she is substantially impaired in a major life activity.*

In order to prevail under the Michigan Handicappers' Civil Rights Act, M.C.L. § 37.1101 *et seq.*, plaintiff first must show that she is disabled as defined by the statute which requires that she be substantially impaired in a major life activity. M.C.L. § 37.1103(e)(i)(A); *see Stevens v. Inland Waters, Inc.*, 220 Mich.App. 212, 215, 559 N.W.2d 61 (1996). Section 37.1103(e) defines "handicap" as "[a] determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position." The Michigan statute does not define the contours of "substantial impairment" or "major life activity," but both parties agree that in construing whether or not plaintiff is disabled as defined by the Michigan statute, the court should be guided by the comparable federal law, namely the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq. Stevens*, 220 Mich.App. at 216, 559 N.W.2d at 63.

The federal regulations accompanying the ADA define a "major life activity" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning and working." 29 C.F.R. § 1630.2(*l*). The regulations further provide that "other major life activities include, but are not limited to, sitting, standing, lifting and reaching." 29 C.F.R. pt. 1630, appendix. The federal regulations further define "substantially limits" to mean that the plaintiff is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which [he or she] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1); *see Penny v. UPS*, 128 F.3d 408 (6th Cir.1997).

Defendants have cited a number of cases where courts have held that mere lifting restrictions do not amount to a substantial impairment of a major life activity. *See, e.g. Vaughan v. Harvard Indus., Inc.*, 926 F.Supp. 1340 (W.D.Tenn.1996) (plaintiff's 20 pound lifting requirement and restriction from sitting or standing for long periods of time did not amount to substantial impairment of major life activity where plaintiff worked as a security guard, tractor driver, cement truck driver, and vinyl siding installer after leaving employment with defendant); *Lamury v. Boeing Co.*, 1995 WL 643835 (D.Kan.1995); (38 pound lifting restriction not "substantial impairment" where plaintiff gainfully employed in variety of positions despite restriction), *Williams v. Avnet, Inc.*, 910 F.Supp. 1124, 1132 (E.D.N.C.1995) (25 pound lifting re-

striction is not "substantial impairment of major life activity," where machine operator was able to land similar employment); *Lowe v. Angelo's Italian Foods, Inc.,* No. 1994 WL 675027 (D.Kan.1994), *rev'd,* 87 F.3d 1170 (10th Cir.1996) (question of fact exists as to whether plaintiff's inability to lift more than 15 pounds substantially interfered with her ability to work).

■ In their reply brief, defendants admit that a lifting restriction might constitute a substantial impairment of a major life activity, depending on the severity of the restriction, but contend that plaintiff's back condition only inconvenienced her ability to lift and did not substantially limit that activity. In support of this argument, defendants rely on plaintiff's husband's testimony that she is able to cook, clean and vacuum, on plaintiff's own deposition testimony that she drives over 100 miles from Monroe to Wayne State University two to three times a week for class, and on the videotape of a private investigator which shows plaintiff bending, lifting and carrying products with ease in 1996 during her activities to assist her husband with his electronic parts distributorship during the same time period that she was on medical leave from her employer. Plaintiff disputes that the video depicts her as being free of pain and contends that she works hard at masking the pain.

Plaintiff further responds that her ten pound lifting restriction does amount to a substantial impairment of a major life activity. In support of this claim, she relies on *Lowe v. Angelo's Italian Foods,* 87 F.3d 1170 (10th Cir.1996). In that case, the Tenth Circuit reversed the district court's order granting summary judgment on plaintiff's ADA claim on the grounds that lifting is a major life activity and a fact question existed as to whether plaintiff was substantially impaired in her ability to lift based on her multiple sclerosis (MS), which is a neurological disorder with no known cure and long-range impact. In reaching its decision, the Tenth Circuit was guided by EEOC regulations requiring the court to consider three factors in

determining whether a disability meets the "substantial impairment" test: "(i) [t]he nature and severity of the impairment, (ii)[t]he duration or expected duration of the impairment, and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(1)(ii). *Id.* at 1173. Unlike the expected long term duration of plaintiff's incurable MS in *Lowe,* the facts of this case are quite different. Plaintiff has presented no evidence that she had an incurable back injury or that her lifting restriction was permanent. At oral argument, plaintiff's counsel was unable to articulate with certainty the nature of plaintiff's injury but believed that it was either a herniated disk or bulge in the L4 or L5 region. Many individuals lead relatively unrestricted lives, even with a herniated disk, and plaintiff has failed to show that her injury significantly limited her daily activities. Under these circumstances, plaintiff cannot show that she suffers from a substantial impairment of a major life activity. Accordingly, she is not entitled to bring a suit for disability discrimination under the MHCRA.

B. *Plaintiff's employer offered her a reasonable accommodation.*

■ Even if plaintiff could show that she is handicapped as defined by the statute, her claim still fails as a matter of law because her employer proposed a reasonable accommodation. When notified of plaintiff's lifting restriction, her employer suggested that she break down the boxes of sample product and use a cart in order to accommodate her ten pound lifting restriction. Plaintiff contends that this was not a feasible proposal because bending over to break down the boxes of sample would have caused her too much pain to complete the task. Plaintiff's opinion about her limitations is not supported by the opinion of her own treating physician and is contradicted by an independent medical examination conducted in April, 1996 which concluded that plaintiff could

perform her job without any restrictions. (Defendants' Ex. L). The doctor's note plaintiff relies upon does not support her position that she was restricted from bending. It stated only a lifting restriction and that plaintiff should not sit for prolonged periods:

> This letter is in reference to Michelle Plumb's restrictions due to her back injury. Michelle should not lift more than 10 pounds. Michelle stated that she had a luggage cart. However, there is the issue of carrying product from her garage, where the product samples are stored, to her car and then from her car onto the luggage cart. If possible, I would recommend another means of delivering samples to her customers directly from the company to the customer (i.e. UPS or other delivery service). Prolonged sitting should also be avoided. Michelle can get out of her car throughout the day (at least every half hour when driving short distances and every hour when driving long distances) and briefly walk around before resuming her driving.

(Plaintiff's Ex. 7). Under these circumstances, plaintiff's disability discrimination claim fails.

C. *Plaintiff failed to give written notice of her need for reasonable accommodation.*

Finally, in their reply brief, defendants contend that plaintiff's handicap discrimination claim must be dismissed because plaintiff failed to request a reasonable accommodation in writing as required by the statute. The Michigan HCRA provides, in relevant part:

> A person with a disability may not bring a civil action under subsection (1) for a failure to accommodate under article 2 unless he or she has notified the person of the need for accommodation as required under section 210(18).

M.C.L. § 37.1606(5). Section 37.1210(18) requires that a plaintiff give timely written notice of a need for accommodation before liability for the failure to provide such an accommodation arises under the statute:

> (18) A person with a disability may allege a violation against a person regarding a failure to accommodate under this article only if the person with a disability notifies the person in writing of the need for accommodation within 182 days after the date the person with a disability knew or reasonably should have known that an accommodation was needed.

M.C.L. § 37.1210(18). In this case, there is no dispute that the only written notice which plaintiff provided was a note from her doctor restricting her to lifting no more than 10 pounds and from prolonged sitting. In that letter, plaintiff's doctor recommended that plaintiff be allowed to deliver the product to her customers by a delivery service such as UPS. Nothing about that doctor's note, however, precluded plaintiff from the accommodation which her employer proposed, which was to break down the boxes of product so that plaintiff complied with her ten pound lifting restriction. Plaintiff does not dispute that if the boxes of product were opened and smaller amounts of the samples were removed, that those samples weighed less than 10 pounds and were within her lifting restriction.

Defendants cite to the case of *Backer v. Wyeth–Ayerst Laboratories,* 949 F.Supp. 512 (W.D.Mich.1996), *aff'd,* 142 F.3d 431, 1998 WL 96563 (6th Cir.1998), for the proposition that the MHCRA, like the ADA, requires only that an employer provide a reasonable accommodation, not necessarily the specific accommodation requested by the plaintiff. In that case, plaintiff had a chemical sensitivity to perfume, pollen, mold, and cleaning products which caused respiratory problems. She requested that she be transferred to a particular building, in addition to other things. The court found that her employer's failure to accommodate that specific request did not amount to discrimination because the employer made numerous allowances for plaintiff's condition including medical leave, breaks, a clean air machine

and dust masks and transfer within the same building. *Id.* at 518. Moreover, plaintiff failed to establish that she could perform her job if the requested transfer was allowed because many allergens and chemicals were present in the sought after location as well. *Id.* at 517. Plaintiff argues that *Backer* is distinguishable because breaking open the cases of product samples was not reasonable for her and her employer allegedly had no reason to bar her from using UPS to ship product. Plaintiff has no evidence, other than her own testimony, to support her contention that she could not break open the boxes.

■ In addition to evidence that her employer proposed a reasonable accommodation, defendants also have shown that plaintiff's request to use UPS would have posed an undue burden. Abbott had a general corporate policy that product sample should be delivered personally to improve customer relations. The corporate memorandum regarding distribution of gratis products specifically provides:

> Other than acquainting recipients with Ross POF products, the foremost reason for investing in gratis merchandise is to provide an opportunity for Ross representatives to continue meeting members of our target audiences. Personal delivery provides those opportunities and each Sales Representative should strive to achieve maximum exposure via this method. Deliveries by UPS or truck lines are available when geography or circumstances interfere with personal delivery, *but these methods should be avoided whenever possible.*

(Defendants' Ex. B). Plaintiff has failed to show that she could not have performed her job by breaking down the boxes of gratis product. While doing so would clearly have been more inconvenient to her than the accommodation she requested, the MHCRA does not allow handicapped employees to dictate the accommodations their employers must provide, whatever the cost or consequences. It requires only that reasonable accommodations be provided which is exactly what plaintiff's employer offered her in this case. Having rejected her employer's offer of a reasonable accommodation, plaintiff is not entitled to sue on the theory that a better accommodation should have been provided. Accordingly, her disability discrimination claim shall be dismissed.

### III. *Intentional Infliction of Emotional Distress*

■ In order to prove an intentional infliction of emotional distress claim, plaintiff must prove 1) extreme and outrageous conduct on the part of the defendant, 2) intent or recklessness, 3) causation, and 4) severe emotional distress. *Roberts v. Auto–Owners Ins.,* 422 Mich. 594, 602, 374 N.W.2d 905, 908 (1985), *Haverbush v. Powelson,* 217 Mich.App. 228, 234, 551 N.W.2d 206, 209 (1996), *Linebaugh v. Sheraton Michigan Corp.,* 198 Mich.App. 335, 342, 497 N.W.2d 585 (1993). Defendants argue that plaintiff's intentional infliction of emotional distress claim must be dismissed because the conduct alleged fails to meet the burdensome threshold requirement that it be "extreme and outrageous." Plaintiff argues that considering the totality of the circumstances, the conduct does in fact rise to the level of "extreme and outrageous" conduct because Ruse abused his supervisory position. In making this argument, plaintiff relies on *Margita v. Diamond Mortgage Corp.,* 159 Mich.App. 181, 190, 406 N.W.2d 268, 271 (1987) where the Michigan Court of Appeals stressed that the court must consider the position of the defendant accused of intentionally inflicting emotional distress in context in deciding whether defendant's actions give rise to liability for that tort. In *Margita,* the court found that fact questions precluded summary judgment where defendant, a mortgage lender, had aggressively attempted to collect a debt that was not overdue through abusive tactics. *Id.* The court reached its conclusion based not only the outrageous acts of defendant, which included repeated harassing telephone calls and letters, but by considering these acts in the context of

defendant's undisputed authority to destroy plaintiff's credit rating. *Id.* Unlike the facts in *Margita*, the conduct alleged in this case simply does not rise to the level of extreme or outrageous conduct even when Ruse's supervisory position is taken into account. Although Ruse was plaintiff's supervisor, there were other superior officers within Abbott to whom Ruse answered and to whom plaintiff could have complained about his allegedly boorish conduct. Unlike the threat of foreclosure and the loss of a favorable credit rating which were at issue in *Margita*, plaintiff has not shown that Ruse's conduct actually threatened her employment or civil liberties. Moreover, plaintiff chose not to avail herself of her employer's anti-harassment policy and willingly let Ruse's alleged conduct go unchallenged. Under the record as presented, there is no merit to plaintiff's intentional infliction of emotional distress claim.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment hereby is GRANTED.